UNITED STATES of America

v.

Michael MORRONE, a/k/a Mike Morrone, Ronald Turchi, a/k/a Ronnie Turchi, Gaeton Cassello, a/k/a Junior Cassello, Nicholas Spadea, a/k/a Nicky Spadea, David DiStasio, William Fox, a/k/a Bill Fox, Moderwell L. Kester, a/k/a Lee Kester.

Crim. No. 79–71.

United States District Court,
E. D. Pennsylvania.

Oct. 27, 1980.

Ronald G. Cole, Sp. Atty., Philadelphia Strike Force, Philadelphia, Pa., for the Government.

Ronald F. Kidd, Philadelphia, Pa., for Morrone.

Joel Harvey Slomsky, Philadelphia, Pa., for Turchi.

Frank J. Marcone, Media, Pa., for Kester.

Joseph C. Santaguida, Philadelphia, Pa., for Cassello.

## OPINION

DITTER, District Judge.

Three defendants, Michael Morrone, Ronald Turchi, and Moderwell Kester were convicted by a jury of nine counts of mail fraud, a violation of 18 U.S.C. § 1341. Morrone, Turchi, and Gaeton Cassello were convicted of racketeering, a violation of 18 U.S.C. §§ 1961–63, and of conspiracy to

engage in racketeering, a violation of 18 U.S.C. § 1962(d). Their two co-defendants, William Fox and David DiStasio, were acquitted. Another co-defendant, Nicholas Spadea, was found to be incompetent to stand trial and the indictment against him was ultimately dismissed. Defendants have filed post-trial motions contending that they were prejudiced by pre-trial rulings, rulings during the trial, and errors in the charge to the jury. For the reasons which follow, their motions must be refused.

The evidence, which because of the verdict must be viewed in the light most favorable to the Government, showed that in 1975 Michael Morrone operated a diner in Philadelphia, employing Ronald Turchi, Gaeton Cassello, and Richard Coppola. Coppola was to become the chief Government witness at trial. In November, 1975, Morrone directed Coppola to assist Turchi and Cassello in the setting of a fire at the Archway Tavern, Front and Arch Streets, Philadelphia. Pursuant to these instructions, Coppola bought naphiho, a flammable liquid, and helped Cassello prepare paper fuses to spread the flames. The next day he drove Turchi and Cassello to the bar and carried the incendiary materials in through the rear entrance. He then left. Acting again on Morrone's instructions, Coppola picked up Turchi and Cassello later that evening. They told him they had set the fire. Coppola drove near the bar and could see the flames shooting out into the street. The next day, the three reported to Morrone the events of the night before. When Morrone directed Coppola to return and examine the building, Coppola saw that it had been heavily damaged by fire.

Several months later, Turchi and Coppola obtained work at Schmidt's Brewery where Morrone was employed in a supervisory capacity. One day, Coppola observed that Morrone and Turchi met with a man whose name Coppola later learned was Harry Bassion. Immediately after the meeting, Morrone told Coppola they had a big "score" coming up. Coppola interpreted this expression to mean that they would be involved in some significant criminal activity. Following another meeting between Turchi

and Harry Bassion, which Coppola also observed, Turchi told Coppola they were planning the arson of a bar as soon as the occupants of rooms upstairs vacated the premises. Several days later, Bassion met Coppola and handed him the keys to the Blue Bell Bar, which was owned by the wife of William Fox. Coppola then delivered the keys to Turchi. In March, 1976, at Morrone's instructions, Coppola, Turchi, and Cassello drove to the bar and set it on fire. Coppola received $250. from Turchi for his participation in this crime. After the fire, and again at Morrone's direction, Coppola and Turchi met with Harry Bassion at the Continental Bank to obtain a loan. After Bassion co-signed the obligation, the bank issued a check to Coppola for $5,000. He cashed the check and together with Turchi gave the money to Morrone. Coppola did not repay the loan but from the bank's records, it could be inferred that Bassion did.

In January, 1977, the Commercial Office Supply Co., the sole occupant of Moderwell Kester's warehouse at 1150 East Orthodox Street, Philadelphia, told him of its intention to terminate its lease. Although he had hoped to sell the property for $125,000, Kester eventually accepted an offer of $65,000 with settlement scheduled for May 6, 1977. The original printed agreement of sale form provided that the parties' respective obligations would not be affected in the event of loss by fire. However, as a result of negotiations between Kester and the purchaser, it was agreed that in the event of fire or casualty loss, the contract would be considered automatically terminated.

A few weeks later, in April, 1977, Morrone told Turchi and Coppola that a big "score" was coming up. On April 28, 1977, Morrone, Turchi, and Coppola drove to one of the parking lots of the Philadelphia Zoo where, according to Morrone, they were to meet with the owner of the building which they were going to burn. After they had waited for about 45 minutes, Coppola got out of the car and remained at that parking lot while Morrone and Turchi drove to the

Zoo's other parking lot. When they returned, Morrone said the "score" would be worth a quarter of a million dollars.

On Monday, May 2, 1977, acting upon Morrone's instructions, Turchi and Coppola went to the warehouse on Orthodox Street. They were to pick up a down payment from the owner and get the keys to the building. On the second floor of the building, Turchi and Coppola met a man, identified at trial by Coppola as Kester, who handed $5,000 to Turchi and also gave him the keys to the building. Later that day, Turchi and Coppola delivered the money to Morrone. On Wednesday, May 4, 1977, Morrone met with Turchi and Coppola at Schmidt's and told them to get the necessary materials and start the fire before Friday. Coppola and Turchi then got five large plastic containers of gasoline, and on Thursday, May 5, drove to the warehouse using a car Coppola borrowed from his girl friend, Pat Bressi. They hid the gasoline inside the building, but decided not to start the fire then because there were too many children playing nearby.

Late that afternoon, Turchi and Coppola returned to the warehouse with Nicholas Spadea, who also worked at Schmidt's. However, they decided there were still too many children near the warehouse to permit them to start the fire. Accordingly, the three men returned to Schmidt's and called Morrone. He came to the brewery and instructed a fourth man, David DiStasio, to go with the other three and to use a second car. The four paired up and set off in Coppola's and Turchi's cars. Spadea waited in Turchi's car several blocks from the warehouse, while the other three drove to the building in Coppola's car. While DiStasio remained in the car, Turchi and Coppola went into the building and poured gasoline on the floors. Coppola lit a match, but as the fire started, he was engulfed in flames. He was badly injured, but with Turchi's help got to the car after discarding much of his clothing. The four men returned to Schmidt's and Morrone was informed of what had occurred. At Morrone's direction, Coppola was taken to the home of Morrone's sister where he was treated by a doctor. Turchi and DiStasio then took Coppola to the home of Pat Bressi where he stayed during his period of recuperation.

The warehouse was not destroyed, but it suffered damage of about $20,000. Thereafter, Kester filed insurance claims which resulted in certain matters going through the mails. It was these mailings which formed the basis for the mail fraud charges on which Morrone, Turchi, and Kester were convicted. On December 13, 1977, two agents from the Bureau of Alcohol, Tobacco and Firearms (ATF), Harold C. Perlick and Robert Piccirilli, went to Kester's place of business and served a Grand Jury subpoena upon him. In addition, they talked with him about the fire. Kester admitted he had planned the fire with a stranger he met in a bar. Kester then told the agents he wanted to say nothing further prior to his talking with his lawyer. When the agents started to leave, Kester asked what he could do to help himself. The agents stated that if he decided to cooperate with the authorities, they would recommend that the court be made aware of that fact. Although Kester said he had been drinking, his demeanor and speech appeared to be normal to the agents.

## I. All Defendants' Contentions

### A. Coppola's "Recantation"

■ All defendants first contend that they should be granted a new trial because the principal witness against them, Richard Coppola, recanted. There is no merit in their position.

Like the defendants in this case, Coppola was indicted for mail fraud, racketeering, and conspiracy. He entered a plea of guilty to certain of these charges before the Honorable Joseph L. McGlynn, Jr., on December 1, 1978, Crim. No. 78–295–2. Sentence was imposed by Judge McGlynn on September 6, 1979. Thereafter, Coppola petitioned for leave to withdraw his plea of guilty, contending that he had been coerced by the Government into testifying falsely in the proceedings before me. Judge McGlynn conducted evidentiary hearings and after

they were concluded on November 16, 1979, stated:

Well, I don't have any difficulty with this petition.

In this proceeding to withdraw his guilty plea, I think Mr. Coppola is lying in his teeth. His testimony is completely incredible. It's refuted by his statements before me at the change of his plea, by his statements given to the agents, by the agents themselves, and by Mr. Cole, by his testimony before Judge Ditter; all of these things convince me that this man is now lying. And, Counsel for Mr. Coppola asked me why he would do this? And, I have a pretty good idea why he would do this. I think he has been reached between the time that he testified before Judge Ditter in that other case, and now. And, I think that perhaps the Justice Department ought to look into it, and see if there has been any obstruction of justice or subornation of perjury.

In this instance, I have no difficulty in concluding that Mr. Coppola was not coerced, or forced, or in any way denied any of his rights in connection with his entering a guilty plea. He was fully advised of his rights by me, he acknowledged he understood them. He acknowledged the fact that his plea had to be free and voluntary. All of these factors were gone into at the time he changed his plea.

On April 22, 1980, Coppola pleaded guilty to conspiracy to obstruct justice, Crim. No. 80–144, before the Honorable Louis C. Bechtle. He admitted receiving $10,000. from a relative of one of the arson defendants. He used $5,000 to pay the attorney who represented him when he petitioned to withdraw his plea of guilty and retained $5,000 himself. See In re: Grand Jury Investigation (Subpoena to Nino V. Tinari), 631 F.2d 17 (3d Cir. 1980). He was then sentenced for this offense.

Both Judge McGlynn's findings and the subsequent events show that Coppola's recantation was procured and should not be credited. It cannot serve as the basis for post–trial relief for these defendants.

**B. The Cautionary Instruction Concerning Turchi's Testimony**

All defendants assign as prejudicial error my instructions that the testimony of Ronald Turchi should be received with caution and viewed with great care. Turchi's own contentions in this regard are the most detailed. In summary he argues that although he was not an accomplice, I gave the jury an accomplice instruction. He maintains that the policy reasons which require a cautionary charge as to accomplice witnesses who testify for the prosecution are inapplicable to witnesses who testify for the defense. Moreover he contends I implied to the jury that he was an accomplice and thus reduced the Government's burden to establish guilt beyond a reasonable doubt.

As is always the case, a portion of the charge about which complaint is made must be viewed in light of what took place at trial and in connection with the rest of the instructions. Turchi's challenge is to four paragraphs which dealt specifically with his credibility. It was prompted not only by Turchi's testimony, but also by counsels' summations.

Of the six defendants, only Kester and Turchi took the stand. Turchi said he first met Coppola in 1975. About a week prior to the fire he agreed to participate with Coppola in the burning of the Orthodox Street warehouse. He knew it would be criminal to do so, but wanted the money he said Coppola offered. On May 4, 1977, he and Coppola drove to the Orthodox Street property. On the way, Coppola explained what was going to happen. When they arrived, they took certain plastic containers of gasoline and trash bags with rolled up paper in them from Coppola's car and hid them in the warehouse.

The next morning they met and "went over a few things." Late in the afternoon, Coppola called him, and they drove to the warehouse. On the third floor they got the materials that Coppola had there. They spread them all around. Coppola poured gasoline and Turchi asked him if he knew

what he was doing. Coppola replied that he did. They argued and Coppola said he was not going to start the fire. Nonetheless, he did so and at the same time set himself on fire. Turchi said he pulled Coppola's clothes off and drove him to Pat Bressi's house.

Turchi said that he had not been involved with Coppola in any acts of arson prior to that time nor since then. He specifically denied having anything to do with the fire at the Archway Tavern or the fire at the Blue Bell Bar.

Turchi denied seeing Kester or Fox prior to the trial, but testified he knew the other defendants. In the summer of 1975, he and Cassello rented a diner from Morrone and employed Coppola to run it. That arrangement continued until mid-1976 when Turchi went to work at Schmidt's brewery where Cassello and DiStasio also worked, Morrone was general manager, and Spadea dock supervisor. Later Coppola also came to work at Schmidt's, and at one time, Morrone fired them both, but then rehired them. Turchi said he had never engaged in any racketeering enterprises, mail fraud, or conspiracy with the other defendants. Morrone never gave him any order regarding any fire or arson, nor did he ever hear Morrone tell Coppola, DiStasio, or Cassello anything about a fire. He also denied seeing Kester at the warehouse, and receiving from Kester any money or the keys to the building.

Thus, Turchi denied the salient features of Coppola's testimony about the involvement of Morrone and Cassello in activities from which the jury could find them guilty of mail fraud and racketeering. His testimony absolved DiStasio and contradicted Coppola as to Kester. Turchi did, however, admit helping commit arson at the Orthodox Street warehouse. Of course, he was not charged with arson and his being involved with only one fire would not make him guilty of engaging in racketeering activities or conspiracy to do so. In short, Turchi not only denied his own guilt, but exculpated Morrone, Cassello, and DiStasio.

During his summation, counsel for each defendant attacked Coppola's credibility. In addition, DiStasio's lawyer argued that Turchi was to be believed because he had incriminated himself. Counsel for Morrone also contended that Turchi, who had exonerated Morrone, should be believed because his testimony had been corroborated and because he had subjected himself to the serious charge of arson.

Counsel for Turchi claimed that Turchi had no motivation to lie. He went on to say,

Ladies and Gentlemen of the jury, in the Commonwealth a felony in the first degree is punishable by a period of imprisonment for twenty years. In the Commonwealth of Pennsylvania starting a fire deliberately with the result of endangering human life by statutes of this State, Section 3301 of the Pennsylvania Criminal Code, is a felony of the first degree.

Mr. Turchi at great jeopardy to his own freedom and to his own future took the stand here to be vindicated by this jury for that which he did not do and in so protecting himself he admitted that which he has done.[1] I think that is a case of a man with every motivation to lie who has still told the truth. *I submit to you that for that reason alone you should believe Ronald Tuchi*, and you should believe that the fraud perpetrated on this jury has been Richard Coppola and you should, as Mr. Cole suggested if you believe Ronald Turchi, you should find him not guilty of all the charges. (emphasis added) (N.T. 14–180–81)

There was therefore presented to the jury the proposition that Turchi's credibility was established by his admitting he was an arsonist and thus that he and the other defendants should be found not guilty of the charges in this case.

---

1. This statement, of course, was untrue. Turchi risked nothing. The Supreme Court of Pennsylvania had previously ruled that one who has been acquitted in federal court on a charge of mail fraud growing out of a fire and a claim for insurance could not thereafter be prosecuted for arson in the courts of the Commonwealth. *Commonwealth v. Grazier*, 481 Pa. 622, 393 A.2d 335 (1978).

Included with my instructions on credibility was an accomplice instruction as to Coppola.[2] I then turned to Turchi and said that although his testimony should also be re-

2. **Charge re Coppola, N.T. 15-29-33**

The testimony of Richard Coppola is of extreme importance in this case and his credibility is a matter which you must weigh carefully and therefore in addition to what I have told you about credibility in general there are some things to be said about his credibility in particular. His testimony, if believed, shows that he and certain of the defendants were accomplices in the commission of certain of the crimes charged here.

Now, an accomplice is one who unites with another person in the commission of a crime voluntarily and with common intent. An accomplice does not become incompetent as a witness because of his participation in the crime charged. On the contrary, the testimony of an accomplice alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilty even though not corroborated or supported by any other evidence. However, a jury should keep in mind that such testimony is always to be received with caution and weighed with great care.

Now, in evaluating the evidence received from Richard Coppola you should keep several things in mind.

First of all, in the first place his testimony is a highly significant part of the case introduced on behalf of the Government. If you do not accept the essential part of what Richard Coppola says, you cannot convict any of the defendants of anything.

The second reason why you should look with particular care at Richard Coppola's testimony is founded upon his admitted involvement with certain criminal activity.

Most witnesses come in to court presumed to be innocent, unless shown otherwise, of any act which might cast doubt upon that witness' truthfulness. No such presumption exists so far as Richard Coppola is concerned. He has admitted his part in acts which may cause you to question his veracity.

The third matter which you may consider in evaluating the testimony of Richard Coppola is the agreement which he made with the Government concerning his being prosecuted and concerning his giving evidence in this matter. In this regard you may consider whether any hope of reward, any fear of disfavor, any expectation of leniency or any payment of living expenses in the past or any payment hoped for in the future may have affected in any way the evidence that he gave here in court. Of course, you may also bear in mind any commitment or promise he made to be truthful or any fear that he might have of further prosecution for the giving of false testimony.

In addition, it's been contended to you that Richard Coppola on occasions when he was under oath and on occasions when he was not under oath made statements which were inconsistent with testimony which he gave here in court. If you find that there were such inconsistencies and that they related to matters which were material and important, you may also take that into account in appraising and weighing the testimony of Richard Coppola. Or if you find that they were matters of insignificance but nonetheless help you to understand his truthfulness or lack of truthfulness, you may take them into consideration.

There is no rule of law which forbids a jury's convicting upon the unsupported evidence of one who claims to be an accomplice, or one who has made an agreement with the Government, or one who has made prior inconsistent statements, or one who has done all of those things. However, logically a jury cannot convict upon the testimony of such a person unless it believes him beyond a reasonable doubt.

You may, however, turn to see whether or not there is corroboration for any of the things which Richard Coppola has said. By corroboration we refer to evidence which is supplementary to words offered by the witness and which tends to strengthen and confirm the things which he said. This testimony is to be classed as corroboration and it need not relate solely to the main facts involved, but may be considered as corroborative when it relates to relevant and material facts which have a direct issue on the main facts in this case. Corroborative testimony does not have to occur to all that a witness has said. If corroboration shows that he, or she, has testified truthfully in some important particulars, the jury itself may be convinced that he has done so in others.

Now, here it has been argued to you that there are certain matters or corroboration, and it's also been argued to you on the other side that those matters are so general in nature that they don't corroborate anything. Well, it's going to be up to you to decide, to go through the evidence, if you think that's the proper way to approach it, to determine whether or not there are any matters which corroborate the testimony of Richard Coppola. Sometimes you may find a straw here and a straw there and wind up with something that would burn down a town. On the other hand, you may find no corroboration. It will be up to you to determine whether there is corroboration and if so how that will affect your appraisal of the testimony of Richard Coppola. Even if there is no corroboration you may accept the testimony of Richard Coppola if you find it has the ring of truth.

As I told you before, there is no rule of law which commands you to disbelieve the uncorroborated testimony of one who claims to be an

ceived with caution and weighed with great care, standing alone it was sufficient to work the acquittal of any defendant on whose behalf he testified.[3] It was this portion of the charge which all defendants, but especially Turchi, claim was prejudicial error.

 A defendant is competent to testify, and if he does so, his credibility is to be judged in the same way as that of any other witness.[4] A jury's privilege to take into consideration significant criminal activity in assessing credibility has long been accepted and is specifically recognized by Federal Rules of Evidence 609(a) and 608(b).[5] It follows that some instruction as to the possible effect of Turchi's criminality on his credibility was in order. The question then becomes whether these particular

accomplice. The determination of whether corroboration is necessary or the sufficiency of such corroboration is solely for you. The only requirement of law is that such testimony is always to be received with caution and weighed with great care.

**3.** Charge re Turchi, N.T. 15–33-35

Just as the testimony of Richard Coppola requires particular attention in view of his being an accomplice, so does the testimony of Ronald Turchi require special attention. Some of the things that I said about Richard Coppola apply with equal force to Ronald Turchi. His testimony if believed, shows that he and Richard Coppola were accomplices in the commission of arson, a serious crime under the laws of Pennsylvania. However, one who admits serious crimes remains competent to testify on behalf of either the Government or the defense. Thus, the testimony of Mr. Turchi alone, if believed by the jury, may be of sufficient weight to raise in your mind a reasonable doubt, or be substantive evidence of innocence as to the defendants on whose behalf he testified. And this is true even if such testimony is not corroborated or supported by other evidence. However, you should keep in mind that the testimony of someone like Mr. Turchi is always to be received with caution and weighed with great care. Much the same reasoning that is applicable to Mr. Coppola is applicable to Ronald Turchi.

Ronald Turchi's testimony is highly significant so far as the defendants Morrone and DiStasio are concerned, since he testified that they had no part in the Orthodox Street warehouse fire. If you believe him you could not find either of them guilty.

The second reason why you should look with particular care at Mr. Turchi's testimony is founded upon his admitted involvement with a criminal activity. His admitted participation with a significant criminal activity may cause you to question his veracity. Whatever the effect of his testimony may be so far as others is concerned, you may also consider it insofar as his own guilt is concerned. You may look to the evidence to see if there is corroboration for the things that Mr. Turchi said. If there is corroboration, just as you may examine the testimony of Richard Coppola in light of that corroboration, so you may find that corrobora-

tion will strengthen the testimony of Mr. Turchi.

Bear in mind, however, insofar as Ronald Turchi testified on behalf of other defendants, his testimony may be sufficient standing alone without corroboration to work their acquittal. However, you should receive such testimony with caution and weigh it with great care.

**4.** *Smith v. United States*, 358 F.2d 683, 684 (3d Cir. 1966), 1 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions, § 17.12 (3d ed. 1977), and cases cited therein.

**5.** Rule 609(a) of the Federal Rules of Evidence provides:

(a) *General rule.* For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross- examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

In pertinent part Rule 608(b) provides:

(b) *Specific instances of conduct.* Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness,

. . . .

The two rules may be read together. Rule 609(a) establishes the type of criminal activity that may be considered on questions of credibility. Under 608(b), conviction is not a prerequisite to bringing such matters before the jury. This is not to say, however, that in this case I would have permitted the Government to elicit from Turchi on cross-examination his activities as an arsonist. Obviously, that question is not before me. Nonetheless see 36 A.L. R.Fed. 564.

instructions were erroneous. Analysis and precedent show they were not.

In the first place, large discretion is vested in the trial judge as to the language to be used in an instruction. In forming a charge on the elements bearing on credibility, the judge is not to be bound to a hard and fast formula as to each phase of his charge, but it is proper to instruct the jury as to the matters which they may or should consider in determining the questions involved. *United States v. Rajewski*, 526 F.2d 149, 160 (7th Cir. 1975), cert. denied, 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 833 (1976).

 Secondly, as was said in the charge approved by the Supreme Court in *Hoffa v. United States*, 385 U.S. 293, 312 n. 14, 87 S.Ct. 408, 418 n. 14, 17 L.Ed.2d 374 (1966),

> All evidence of a witness whose self–interest is shown from either benefits received, detriments suffered, threats or promises made, or any attitude of the witness which might tend to prompt testimony either favorable or unfavorable to the accused should be considered with caution and weighed with care.

Turchi was plainly motivated by self–interest. Had his testimony been accepted, it would have exonerated him and three of his co–defendants. It was no slip of the tongue or editorial nicety when his counsel announced, "Your Honor, *we* call the defendant Ronald Turchi." (emphasis added, N.T. 13–210).

In view of Mr. Turchi's claim to have been Coppola's accomplice to the state crime of arson, those opinions which deal with an accomplice who testifies for the defense are instructive. The leading case is *United States v. Nolte*, 440 F.2d 1124 (5th Cir.), cert. denied, 404 U.S. 862, 92 S.Ct. 49, 30 L.Ed.2d 106 (1971). There it is said,

> Nolte insists, however, that the instruction may only be given when an accomplice testifies for the prosecution, and not when he testifies in behalf of the defendant. We disagree. *It is clear that an accomplice's credibility may be suspect, regardless of whether he testifies for the*

*prosecution or the defense. Moreover, the trial judge's decision whether to give the instruction is not a matter requiring constitutional scrutiny. At most, it is "merely a part of the general conduct of the trial, over which the judge's powers are discretionary like his control over cross–examination, or his comments on the evidence." United States v. Becker, 2 Cir. 1933, 62 F.2d 1007, 1009; accord, Lyles v. United States, 5 Cir. 1957, 249 F.2d 744, 746, cert. denied, 1958, 356 U.S. 931, 78 S.Ct. 773, 2 L.Ed.2d 761. Whether an accomplice testifies for the prosecution or, as here, for the defense, it is within the trial judge's discretion to instruct the jury to accept an accomplice's testimony with caution.* (emphasis added) 440 F.2d at 1126–27.

*United States v. Urdiales*, 523 F.2d 1245, 1248 (5th Cir. 1976), cert. denied, 434 U.S. 1071, 98 S.Ct. 1253, 55 L.Ed.2d 774 (1978) and *United States v. Simmons*, 503 F.2d 831, 837 (5th Cir. 1974), are to the same effect. In *United States v. Mitchell*, 385 F.Supp. 1190, 1193 (D.D.C.1974), aff'd, 559 F.2d 31 (D.C.Cir. 1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), Judge Sirica ruled that if an unindicted co–conspirator had been called as a witness for the defendant, the testimony of that witness would be subject to the instruction that it should be received with caution and scrutinized with care. The accomplice instruction in E. Devitt and C. Blackmar, Federal Jury Practice and Instructions § 17.06 (3d Ed. 1977), includes the suggestion that a jury be told that the testimony of an accomplice "is always to be received with caution and considered with great care." As the authors point out in section 17.06, page 533, this instruction can be used whether the accomplice testifies for the prosecution or for the defense.

A variety of cases state that three policy reasons support the cautionary instructions given when an accomplice testifies: his testimony is of extreme importance, he has admitted his part in criminal activity, and he has a motive to lie. These same reasons applied to Turchi, and although I did not

tell the jury that he had a motive to lie, I did explain that his testimony should be looked upon with particular care because of its significance and because he admittedly had been involved in criminal activity. Of course, I did not stop there: I also told the jury that Turchi's testimony alone could raise a reasonable doubt or be substantive evidence of innocence. I told the jury that although it could look for corroboration, it was not necessary and that Turchi's unsupported testimony could bring about an acquittal of any defendant for whom he testified. This provided the "fair and balanced perspective as context for deliberation" suggested by *United States v. Lee*, 506 F.2d 111, 123 (D.C.Cir. 1974), cert. denied, 421 U.S. 1002, 95 S.Ct. 2403, 44 L.Ed.2d 670 (1975). See also *United States v. Gleason*, 616 F.2d 2, 15 (2d Cir. 1979), cert. denied, 444 U.S. 931, 1082, 100 S.Ct. 1037, 1320, 62 L.Ed.2d 764, 767 (1980).

In a somewhat different context, the Third Circuit has recently said a trial court should instruct the jury that it can either convict or acquit on the basis of accomplice testimony. *United States v. Armocida*, 515 F.2d 29, 48 (3d Cir.), cert. denied, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975), citing *Cool v. United States*, 409 U.S. 100, 103 n. 4, 93 S.Ct. 354, 356 n. 4, 34 L.Ed.2d 335 (1972). Based upon these cases and *United States v. Stulga*, 531 F.2d 1377 (6th Cir. 1976), a failure to give some instruction as to Turchi's testimony—for example, as I did, that it "may be sufficient standing alone without corroboration" to work the acquittal of the defendants who benefitted from it—might well have been cited as plain error. The instruction I gave was balanced and eminently fair.

■ Turchi complains, however, that I implied he was an accomplice in the crimes charged in the bill of indictment and thus impaired the requirement of proof beyond a reasonable doubt. There was no such statement.[6] What I did say was that if Turchi's testimony was believed, it showed he and Coppola were accomplices in the commission of arson, which was exactly the basis on which defense counsel said his testimony was of enhanced credibility. I did not even suggest he was an accomplice to the crimes charged, but only that his testimony required special attention. Turchi argues, however, that since I told the jury that the testimony of a claimed accomplice (Coppola) was to be received with caution and weighed with great care and since I said that Turchi's testimony was to be received with caution and weighed with great care, that I was saying that Turchi was an accomplice. Logically and legally, this argument is fallacious. Logically, the argument could only be persuasive if the jury had been specifically charged that only the testimony of accomplices—and no other persons—was to be received with caution and weighed with great care. Of course, no such instruction was given. The argument is untenable legally because it depends upon the accuracy of the claim that the "receive with caution and weigh with great care" instruction applies only to accomplices. Such is not the case. Cautionary language of the type used has been mandated by the Third Circuit for identification witnesses under certain circumstances, *United States v. Barber*, 442 F.2d 517, 528 (3d Cir.), cert. denied, 404 U.S. 846, 958, 92 S.Ct. 148, 327, 30 L.Ed.2d 83, 275 (1971), and for perjurers, *United States v. Margolis*, 138 F.2d 1002, 1004 (3d Cir. 1943). In addition, it has been said, there is no significant difference between the cautionary instructions to be used for accomplices and those for immunized witnesses, *United States v. Morgan*, 555 F.2d 238, 243 (9th Cir. 1977), or for informers, *United States v. Gonzalez*, 491 F.2d 1202, 1207 (5th Cir. 1974). Such in-

---

**6.** It is true I said, "Just as the testimony of Richard Coppola requires special attention in view of his being an accomplice, so does the testimony of Ronald Turchi require special attention." Of course, I should have referred to Coppola as being an accomplice if his testimo-ny "is believed"—or as "one who claims to be an accomplice" as I had before. Though my characterization of Coppola as an accomplice was erroneous, in view of what I previously had said about him and in view of what I said thereafter about Turchi, it was harmless error.

structions should also be given, even though unrequested, as to the testimony of an addict–informant, *United States v. Kinnard,* 465 F.2d 566, 572 (D.C.Cir. 1972).[7]

In light of the many instances when an instruction of this type may and should be given, there is no merit in the argument that it was prejudicial here.

7. In *United States v. Jasper,* 523 F.2d 395, 399 (10th Cir. 1975), cert. denied, 423 U.S. 1075, 96 S.Ct. 859, 47 L.Ed.2d 85 (1979), the court criticized an instruction that the testimony of a prison inmate should be carefully scrutinized because he had been convicted of a crime. Nonetheless, the instruction was not held to be erroneous. It must be noted that by reason of Federal Rule of Evidence 609 this instruction would now be too broad.

8. What I actually said was (N.T. 16–5–8):

I take it from that you mean that you believe that your deliberations have reached a point where you feel that agreement is impossible. Nonetheless, I'm going to ask you to resume them. In doing so, I make this suggestion to you:

First of all, if you have been unable to agree upon certain matters that you turn to other matters to study and try to find exactly where there may be agreement, even if it's only a comparatively few points. In other words, try to see where there is agreement. Sometimes when you find there is agreement on one issue it may lead you to agreement on others. After you have found that there is that possibility, or that impossibility, it may lead you to further thoughts. So the first thing I want you to do is to see whether there can be any agreement on anything at all, even if it is only, for example, on matters that are not necessarily determinative on all of the issues as to any defendant or as to any charge.

Now, why don't (sic) I ask you to do this? Well, first of all, as I'm sure you know without my telling you, that this is an important case. It has been expensive in time, in effort and in money to both the defense and the prosecution. If you fail to agree on a verdict the case is left open and undecided. Like all cases it must be disposed of at some time. There appears to be no reason to believe that another trial would not be costly to both sides, nor does there appear to be any reason to believe that the case could be tried again by either side any better nor anymore exhaustively than it has been tried before you. Any future jury would have to be selected from the same source from which you have been selected.

The issues in this case you may feel are not necessarily easy, and I'm sure that anyone could understand why you feel that way. However, from all that I have seen of you you

## C. The Supplementary Instruction

All defendants object to the supplementary charge which I gave when the jury reported that it was unable to reach any verdict with respect to any defendant. At that time, the jury had been deliberating for a little less than ten hours. The objection is not to the fact that supplementary instructions were given but to their content. In essence,[8] I told the jurors to see if they

are just as intelligent and just as capable of deciding these issues as would be any other jurors that could be impaneled in this court. There is no special reason to believe that some other group on some other occasion would find *these matters less baffling or the testimony* anymore acceptable to being resolved than you have found it. Therefore, if you can decide *these matters in good conscience it is your* conscientious duty to do so.

Now, of course, these things suggest themselves on brief reflection to all of us who have sat through this trial. The only reason I mention them to you especially that this may have escaped your attention because your time has been occupied with viewing the evidence and with your discussions with each other. There are matters, however, which along with others and perhaps more obvious ones, remind us how desirable it is that you reach a unanimous verdict if you can do so without violence to your individual conscience.

I'm going to repeat some of the things that I said to you earlier.

Remember that the standard in this case is that of reasonable doubt and no other. If the Government has satisfied you beyond a reasonable doubt of guilt, you should find a defendant guilty. If the Government has not satisfied you beyond a reasonable doubt as to a defendant, that defendant should be found not guilty.

As I have previously told you, during the course of your deliberations it's your duty to consult with one another, to exchange viewpoints and reach agreement if you can do so without violence to individual judgment. Remember, however, that any decision you reach must be unanimous. That means that each juror must concur and agree in the final conclusion to be returned to us here in court. In the course of your discussions, however, do not hesitate to re examine your own views and to change your opinion if you become convinced it is erroneous.

As I said, it's your duty to decide this case if you can conscientiously do so and you should listen carefully to the arguments of your fellow jurors. However, as I told you before, you should not surrender your honest conviction as to the weight or the effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict to us. Although there must be impartial consideration of all of the evidence on the

could agree on anything, it was an important case, they should consult with each other, and should reach unanimous verdicts if possible to do so without violence to individual conscience. Having heard these instructions, the jury continued its deliberations and after about five hours, returned verdicts finding Morrone, Turchi, and Cassello each guilty on 11 counts and not guilty on eight counts, Kester guilty on nine counts, while William Fox and David DiStasio were found not guilty on the eight and nine counts respectively which faced them.

Defendants contend that the supplemental charge was incorrect and improper because it ignored an order of the Court of Appeals in *United States v. Fioravanti*, 412 F.2d 407 (3d Cir.) cert. denied 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969), and approved in *United States v. Alper*, 449 F.2d 1223 (3d Cir. 1971) cert. denied 405 U.S. 988, 92 S.Ct. 1248, 31 L.Ed.2d 453 (1972).[9] They also say it was prejudicial and coercive under the rationale of *United States v. Burley*, 460 F.2d 998 (3d Cir. 1972), because it emphasized the importance of the case and its costs to the parties, thus suggesting the jury should consider extraneous matters rather than the evidence in making its decisions.

An analysis of these allegations show they simply are not so, that if there was error it was harmless, that the words were not inherently coercive, and that the verdicts demonstrate there was no coercion in fact.

In the first place, this was not an *Allen*[10] charge because there was no suggestion that the minority should defer to the opinions of the majority, the key element of such an instruction. This means that a host of cases which talk about the coercive effect of an *Allen* charge are not applicable to the issues here.[11] The three paragraphs which the defendants say were coercive and prejudicial were taken from 1 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions, Section 18.14 (3d ed. 1977). Neither these words nor any words like them were before the Third Circuit in *Burley*, *Alper*, or *Fioravanti*. They have, however, been considered by other courts and have been found an appropriate way to encourage jurors to pursue their deliberations toward a verdict, if possible, so the expense and delay of a new trial will be avoided. *United States v. Robinson*, 560 F.2d 507, 517 (2d Cir. 1977), cert. denied 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978), citing *United States v. Bermudez*, 526 F.2d 89, 100 (2d Cir. 1975) cert. denied 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976).[12] These words were implicitly approved by the Supreme Court in *Kawakita v. United States*,

---

part of all of you, in the final analysis, each of you must decide each of these matters for himself or herself.

I'm going to ask that you return and resume your deliberations.

9. Although they did not do so, the defendants might have also cited *Government of Virgin Islands v. Hernandez*, 476 F.2d 791 (3d Cir. 1973).

10. The name is derived from the case of *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), in which the Supreme Court approved a charge that was substantially as follows:

[A]lthough the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to

each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

11. It is also true that many courts refer to any instructions given to a jury that is deadlocked, or that the judge may think is deadlocked, as an *Allen* charge, or sometimes an *Allen*-type charge.

12. See also Fifth Circuit Pattern Jury Instructions, Instructions During Trial No. 6, reprinted in 1 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions, Section 18.14 (3d Ed. Supp. 1979).

343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249 (1952). Though not explicitly addressed, the Supreme Court said other matters were "either insubstantial or were so adequately disposed of by the Court of Appeals that we give them no notice." *Id.* at 744, 72 S.Ct. at 966, 96 L.Ed. at 1269. And indeed, the words in question, and the traditional *Allen* instruction that jurors holding the minority viewpoint should consider the logic of those in the majority, were before the Ninth Circuit. See *Kawakita v. United States,* 190 F.2d 506, 524 (9th Cir. 1951). A charge pointing out that "some jury some time will have the duty to decide this case, and *I hope* that you, as the jury in this case, *will be able* to decide this matter." (emphasis supplied by Court of Appeals), as well as the *Allen* instruction to the minority, were before the court in *Fulwood v. United States,* 369 F.2d 960 (D.C.Cir. 1966), cert. denied, 387 U.S. 934, 87 S.Ct. 2058, 18 L.Ed.2d 996 (1967), where Judge Burger (now Chief Justice) said such instructions were a carefully balanced method to remind jurors of their elementary obligations which they can lose sight of during protracted deliberations. See also *United States v. Zicree,* 605 F.2d 1381, 1390 (5th Cir. 1979) cert. denied, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980); *United States v. Papadakis,* 510 F.2d 287, 298–99 (2d Cir.), cert. denied, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975); *United States v. Ringland,* 497 F.2d 1250, 1253 (8th Cir. 1974); *Hale v. United States,* 435 F.2d 737, 739–40 (5th Cir. 1970) cert. denied, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971); *United States v. Wynn,* 415 F.2d 135, 136 (10th Cir. 1969), cert. denied 397 U.S. 994, 90 S.Ct. 1133, 25 L.Ed.2d 402 (1970).

In the second place, the words in question were not coercive. The danger in supplemental instructions is that a minority of the jury may be persuaded against its will and thus the unanimity rule diluted. The pressure usually arises from language which suggests that the minority should reconsider its views, that a verdict should issue within a short period of time, or that some jurors are misbehaving by refusing to join an otherwise unanimous decision. *United States v. Cheramie,* 520 F.2d 325, 329–31 (5th Cir. 1975). Telling the jurors they had to agree was found to be coercive in *Jenkins v. United States,* 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965). Jurors should not be told that a failure to agree would be regarded by the public as reflecting upon the jurors' intelligence or integrity, nor should they be pressured by being told the issues are easy, the court has a backlog, and retrial makes no sense. *United States v. Thomas,* 449 F.2d 1177, 1183–84 (D.C.Cir.1971). Stubbornness in the jury box should not be criticized. *Powell v. United States,* 297 F.2d 318, 320 (5th Cir. 1961). Saying that absolute certainty cannot be expected may be construed as weakening the quantum or quality of the proof required. See *United States v. Silvern,* 494 F.2d 355 (7th Cir. 1973); *United States v. Flannery,* 451 F.2d 880, 883 (1st Cir. 1971).

I told the jurors none of these things.

What I did say was that they had a duty to decide this case if it could be done without violence to individual conscience and I told them why. There is nothing wrong with a jury's being told it has a duty to decide. In *Fioravanti,* supra, for example, the trial judge told the jury, "It is your duty, however, to agree if possible." 412 F.2d at 414. The Court of Appeals found no error in that comment, and to the contrary, recommended that if jurors are instructed to consult with each other they be told, "It is your duty . . . to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment." 412 F.2d at 420.

█ Surely if jurors can be told there is a duty to decide–not just the easy cases, but difficult ones, the ones that require diligent, conscientious effort, there is nothing wrong with reminding them that a particular case is important to those involved. I reject the idea that jurors are too stupid to know that what they do or do not do will have an impact on society and on defendants. And this includes failing to decide a particular case. The ability of the judicial system to

function is not served by turning away but by facing—not by deferring but by deciding—not by abdicating but by acting. There is nothing wrong with a jury's being asked to continue its deliberations so long as it is clear that each member has a duty conscientiously to adhere to his own honest opinion and avoids creating the impression that there is anything improper, questionable, or contrary to good conscience for a juror to cause a mistrial by refusing to agree. *Hale v. United States*, 435 F.2d 737, 741 (5th Cir. 1970), cert. denied 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971).

A judge's warning that under no circumstances must any juror yield his conscientious judgment makes use of even the *Allen* charge proper and not coercive. *United States v. Robinson*, 560 F.2d 507, 517 (2d Cir. 1977), cert. denied 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). I told the jurors the importance of individual judgment six times. I said these matters should be decided if it could be done "in good conscience." (para. 3); "if you can do so without violence to your individual conscience" (para. 4); "if you can do so without violence to individual judgment" (para. 6); and "if you can conscientiously do so" (para. 7). I also said that "you should not surrender your honest conviction as to the weight or the effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict to us ... in the final analysis, each of you must decide each of these matters for himself or herself." (para. 7) It is not coercive to tell a jury to try to reach a verdict if they are told they are not required to do so. *Government of Virgin Islands v. Gereau*, 502 F.2d 914, 936 (3d Cir. 1974), cert. denied 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975).

There was no coercion.

The instructions I gave did not contravene directions given by the Third Circuit as an examination of its recent cases plainly shows. The leading Third Circuit case on the *Allen* charge is *Fioravanti*, supra. There the trial judge had used the traditional *Allen* language directing jurors in the minority to distrust their own judgment. Although the district court was affirmed, Judge Aldisert said at 412 F.2d at 420:

Hereafter, in this circuit, trial judges are not to give instructions either in the main body of the charge or in the form of a supplement that direct a juror to distrust his own judgment if he finds a large majority of the jurors taking a view different from his. Such an instruction will be deemed error, normally reversible error. Conceivably, in very extraordinary circumstances the error may be found so inconsequential as to avoid the necessity of reversal on appeal. But hereafter this court will not let a verdict stand which may have been influenced in any way by an *Allen* Charge.

In footnote 32 on the same page there was a suggestion that if there is any disposition to instruct jurors to consult with each other, that it be done in language which was then quoted. I followed this language—though not verbatim in telling the jurors to consult with each other. See supplemental instructions, paragraphs 6 and 7, N.T. 16–7 and 16–8.

*Alper*, supra, and *Hernandez*, supra, both reiterated what had been said in *Fioravanti*, but did not go beyond it. Since I used neither the language nor the precepts condemned in *Fioravanti* and did use those recommended, its directions were not violated. Defendants place their greatest reliance on *United States v. Burley*, 460 F.2d 998 (3d Cir. 1972). There the trial judge received two notes which said there was one juror who refused to deliberate because she felt the witnesses were not to be believed and because of her understanding of reasonable doubt. With the matter in that posture and after the jury had been deliberating for about four hours, the trial judge had the jury brought back to the court room and repeated his charge on reasonable doubt. He also reviewed the testimony of identification witnesses indicating, at least inferentially, that it seemed to be strong and persuasive. Finally, he told the jury,

Another thing you should bear in mind is this: If this jury cannot agree, the case

is going to have to be tried again. It took almost a week–did take a week–and all those witnesses are going to have to be called back to testify again. They will be subject to examination, cross–examination, and so forth. So, it is not an insignificant event when a jury does not agree in a case like this. It can produce great additional expense to the government and additional–well, I think I have said enough. 460 F.2d at 999.

Judge Hastie, speaking for the Court, said that if reasonable doubt persists a juror's duty is to vote for acquittal and that the possibility of a hung jury and retrial are not relevant to that determination. He pointed out that the trial judge had failed to say that no juror should vote contrary to his best judgment because of the judge's views. He also added that there should be a clear statement of each juror's responsibility to exercise independent judgment.

As I have previously observed, my supplemental instructions repeated six times the admonitions that individual conscience and judgment must prevail. Anything I said about retrial was mere surplusage.[13] My instructions did not review the evidence, as was done in *Burley*, nor were they directed at one person who was holding out for acquittal. The circumstances and the charge in *Burley* simply bear no resemblance to the circumstances and the charge in the instant matter.

■ Finally, the time that elapsed between the giving of the supplemental charge and the jury's verdicts, and the verdicts themselves, show that there was no coercion.

After receiving my instructions, the jury continued its deliberations for a little more than five hours. This shows there was ample time for thoughtful consideration and the absence of coercion. *United States v. Barash*, 412 F.2d 26, 31–32 (2d Cir.), cert.

denied 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969) (three hour lapse); *United States v. Stewart*, 513 F.2d 957, 959 (2d Cir. 1975) (six hour lapse); *United States v. De Stefano*, 476 F.2d 324, 337 (7th Cir. 1973) (four hour lapse); *United States v. Singletary*, 562 F.2d 1058, 1061 (8th Cir. 1977) (one and one–half hour lapse). On the other hand, a time lapse of a few minutes would show a coercive effect. *United States v. Rogers*, 289 F.2d 433, 437 (4th Cir. 1961).

The verdicts themselves show the absence of coercion. Morrone and Turchi were found not guilty of eight of 19 counts, Cassello was found not guilty on eight of ten counts, while Fox and DiStasio were found not guilty on all counts. See *United States v. Pope*, 415 F.2d 685 (8th Cir. 1969), cert. denied 397 U.S. 950, 90 S.Ct. 973, 25 L.Ed.2d 132 (1970).

## II. Kester's Additional Arguments

A. The Absence of *Miranda* Warnings and the Destruction of Interview Notes

The first two reasons advanced by Kester for post–trial relief grow out of testimony given by ATF Agent Harold C. Perlick as to a conversation which he said he and Agent Robert Piccirilli had with Kester on December 13, 1977. According to Perlick, Kester made certain incriminating statements. Kester first asserts Perlick's testimony should have been suppressed because no *Miranda* warnings were given, and secondly, that the indictment against him should have been dismissed because Perlick did not retain his rough notes of interview as required by *United States v. Vella*, 562 F.2d 275 (3d Cir. 1977), cert. denied, 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978). See also *United States v. Niederberger*, 580 F.2d 63, 71 (3d Cir.), cert. denied, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978); *United States v. Harris*, 560 F.2d 148 (3d

---

13. As Judge Burger said in *Fulwood v. United States*, supra,

The statement that some other jury would have to decide the case if this one could not was accurate as a generality and, in any event, could have had no coercive impact on

the jury. If they already knew what would likely happen if they deadlocked, it was surplusage; if they did not know, this information, far from being coercive, would have had the effect of reducing the pressure on them to reach a verdict. 369 F.2d at 963.

Cir.), cert. denied, 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977); and *United States v. Harrison,* 524 F.2d 421 (D.C.Cir. 1975).

■ The first issue, that concerning the failure to give *Miranda* warnings, was previously raised by a pretrial motion to suppress. An evidentiary hearing was held, after which I entered an order, incorporating findings of fact and conclusions of law, and refused the motion. There is nothing I can add to that order. It is attached as an appendix to this opinion.

Kester's second reason is somewhat ambiguously phrased in his post–trial motions and brief. What he says is that Agent Perlick should not have been permitted to testify about the December 13, 1977, statement when it was determined his rough interview notes had been lost or destroyed after a formal report of interview was prepared. The problem is that the destruction of the notes was revealed by the cross-examination of Perlick only after he had testified as to his conversation with Kester. Since I believe Kester's intention is plain, I shall treat his motion as an assertion that Agent Perlick's testimony should have been stricken or that the indictment should have been dismissed once it was established that the interview notes had been destroyed.

In *Vella,* supra, the Court of Appeals stated explicitly

> To avoid future misunderstandings, we specifically adopt the precepts announced in *United States v. Harrison,* 173 U.S. App.D.C. 260, 524 F.2d 421 (1975), as the law in this circuit, to wit, the rough interview notes of F.B.I. agents should be kept and produced so that the trial court can determine whether the notes should be

made available to the appellant under the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or the *Jencks Act.*

562 F.2d at 276. Although the language of *Vella* is obligatory, *Niederberger,* supra, in construing it held that when there was no bad faith by the Government and no specific pretrial request by the defendant, the district court's refusal to strike testimony and refusal to grant a new trial were not errors because even had the testimony of the Government agent been excluded, there was sufficient evidence to convict.

■ *Vella* specifically adopted the precepts announced in *United States v. Harrison,* supra. *Harrison,* in turn, relied on *United States v. Bryant,* 439 F.2d 642 (D.C. Cir. 1971), which interpreted *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to require that "in framing their rules for evidence preservation, investigative agencies must define discoverable evidence very broadly, including any materials that 'might' be 'favorable' to the accused." 439 F.2d at 652 n. 21. *Bryant,* however, predated *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), which held that where there has been only a general request for exculpatory material,[14] or no request at all, the proper *Brady* test for a reviewing judge is whether the omitted evidence would create a reasonable doubt that did not otherwise exist. This means the Government's omission to provide information must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On

---

**14.** In the instant case there was no "pretrial request for specific evidence." See *Agurs,* 427 U.S. at 104, 96 S.Ct. at 2398. Kester did file a pre-trial motion in which he said:

> 6. ... the defendant hereby requests all copies of any and all statements of the defendant, including, but not limited to Grand Jury Hearings, interviews or intercepted messages, telecommunications or memoranda, the substance of any oral statement which the government expects to introduce in evidence, the Grand Jury testimony of any and all witnesses whose information given at any

time during the investigation could be considered exculpatory and would assist the defendant in the defense of the charges filed against him.

The Government responded that it would comply with this request to the extent that the material requested existed. There is no suggestion that the Government did not do so. As previously stated, it was not until after Agent Perlick's direct examination had been concluded that any request for his rough notes was made.

the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. 427 U.S. at 112–13, 96 S.Ct. at 2402. Thus when a court reviews the effect of a failure to preserve possible evidence, the broad rule announced by *Bryant* must be considered to have been modified by *Agurs* and *Niederberger*. I conclude therefore, that if a Government agent has failed to follow *Vella*, in the absence of bad faith on the part of the Government, the appropriate test is whether the notes that were not preserved would have created a reasonable doubt which otherwise did not exist.[15]

 In the instant case, there was no evidence of bad faith or any improper reason for the destruction of the notes. *Vella* was decided on September 19, 1977, less than three months before Perlick's December 13, 1977, interview with Kester. From all that appeared neither the ATF in general nor Perlick in particular was aware of the *Vella* decision. In part, this may be attributable to the wording of *Vella*, which addressed itself only to the F.B.I. While it would be fatuous to contend (and the Government does not do so) that once the *Vella* rule had been made known to ATF, its agents could destroy their rough interview notes, nonetheless, it is entirely possible that ATF was less likely to know of *Vella* because it was specifically directed to the F.B.I. In *Harrison*, supra, it was recognized that a direction to a police department differed from a direction to the F.B.I. Just as the court in *Harrison* refused to attribute any bad faith to the F.B.I. for destroying notes when only the police had

been directed not to do so, 524 F.2d at 434, I shall attribute no bad faith to Agent Perlick or to the ATF, particularly in view of the time sequence here.

The possibility that Agent Perlick's rough notes would have helped Kester is remote. Although he denied any culpability in the fire at his Orthodox Street warehouse, Kester admitted that he told Agent Perlick many of the things about which Perlick had testified. (N.T. 13–166–74; 13–190–93) He claimed to have done so because he had had seven or eight martinis earlier that afternoon and was intoxicated. (N.T. 13–85) He was not totally sober when the agent arrived. (N.T. 13–88) He was half lit (N.T. 13–92), was under the weather, was drunk (N.T. 13–169), and was half drunk (N.T. 13–195). In addition, he was scared and upset (N.T. 13–90, 91, and 195), the agents put words in his mouth (N.T. 13–91, 165, and 167), he was afraid he was going to be beaten up (N.T. 13–175) or have a stroke (N.T. 13–169), and he just said anything to get rid of Perlick (N.T. 13–164, 166, and 174). However, he also testified that after receiving appropriate warnings and with his attorney available to him, he appeared voluntarily [16] and repeated to the Grand Jury the things he had told Agent Perlick (N.T. 13–175, 182).

Kester argued at trial that the preservation and production of Agent Perlick's rough notes might have been helpful in impeaching Perlick as to the date he interviewed Kester (N.T. 13–152; 171–73).[17] Analysis shows, however, that while the notes might have impeached Kester, it is highly unlikely that they would have impeached Agent Perlick. Admittedly, on

---

**15.** This is practically the same balancing test announced for *pre–Bryant* interviews:

> [The court] should weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice. 439 F.2d at 653, as quoted by *Harrison*, 524 F.2d at 434.

**16.** Had he not appeared voluntarily, he would not have been subpoenaed (N.T. 13–178).

**17.** Kester's post-trial brief suggests Agent Perlick may have destroyed his notes because he had a personal reason to do so if they contained *Brady* material since "without Kester, the case would not have federal jurisdiction and Agent Perlick's investigation would have gone for naught." I consider this argument to be preposterous.

He also asserts bad faith was shown because there was no testimony about any ATF policy to destroy notes. The short answer to this contention is that no one asked about the matter.

the date of the interview, Agent Perlick served Kester with a Grand Jury subpoena. On its face, this subpoena shows it was served on December 13, the date shown on Agent Perlick's formal report of interview. Both Perlick and Kester testified the interview took place on that date. (N.T. 10–108; 13–82). It is unlikely Agent Perlick would have put one date on the subpoena and another on his formal report of interview. This is particularly true since the date of the interview became significant only after Kester testified during trial.

The issue as to the date of interview came up in this way. During cross-examination at the suppression hearing, Agent Perlick was asked if Kester had told him one of his trucks had been destroyed "earlier that morning." Perlick said he recalled being told "something about an accident." (Hearing of May 22, 1979, N.T. 18) Kester then testified the accident had occurred that morning (N.T. 47, 56), i. e., the day the agents were there. (N.T. 57) It was partly because of the truck accident earlier that day that he drank so many martinis. (N.T. 58) As he told the Grand Jury, he was drinking heavily that day because "this truck thing upset" him. (N.T. 60) Again at trial the matter of the truck accident was originally brought up during Agent Perlick's cross-examination by Kester's counsel:

Q. ... After this interview was over, sir, did he say something to you about a truck accident?

A. I think he mentioned an accident.

Q. You think? Come on, you know he did, don't you? ... Didn't he tell you that that morning when he had come to work on the 13th of December he had been told by one of his employees that a brand new truck of his had run into a tree and totally destroyed it?
Did he tell you that?

A. I believe he did, yes, some words to that effect. I don't remember specifically whether it was a new truck, but I think he said there was an accident that morning.

Q. And he was very upset about it.

A. He said that, yes.

Q. And at lunch time that day he had gone out, had lunch and drank martinis and had too many.
Didn't he tell you that?

A. He said he was drinking that day. (N.T. 10–227–28).

Kester then testified that he was very distressed on December 13, 1977, because a stupid driver had had an accident with a brand new truck. (N.T. 13–82, 83, 85, 143, 144, and 157). That was the reason he was upset that day (N.T. 13–145, 148), i. e., the day the agents came to interview him. (N.T. 13–150, 152) There were no other accidents involving his trucks about then. (N.T. 13–146)

However, when Kester was shown a report, containing information he said he had provided to his insurance agent which showed the accident had occurred on December 12, 1977, he began to waiver about whether the accident and the interview were on the same date. (N.T. 13–157) He then said he did not know the date of the accident (N.T. 13–162), and finally, that on the day of the interview, all he told the agents about the accident was that the truck had been towed to his garage that morning. (N.T. 13–195) He then accused the Government of having originally said the accident was on December 13 (N.T. 13–161), a charge that quite simply was not true.

█ It was because of the question as to whether the accident and the interview had been on the same date that Kester's counsel wanted the original interview notes. It was obvious, however, from the time Kester's counsel first raised the question during cross-examination at the suppression hearing, Perlick had not thought that what Kester may have said about the truck accident was of sufficient importance to record it. If indeed there had been no notation, the destruction of Perlick's notes was unimportant. If, on the other hand, Agent Perlick's notes had had some notation in this regard, they might have confirmed one of Kester's versions of what occurred on the morning

of December 13, 1977, but refuted another.[18] What Perlick's notes might have said did not go to the issue of guilt or innocence per se, but to Kester's credibility. Of course, Kester's credibility was paramount, but the jury had ample opportunity to judge it from his extensive testimony. I conclude that the missing notes would not have created a reasonable doubt of Kester's guilt.[19]

## B. Jury Sequestration

Kester also argues that two errors were committed insofar as the jury was concerned; first, that it should not have been sequestered, and second, the whole panel should have been excused because one of the veniremen made a remark about a defendant.

The jury was sequestered on motion of the Government. Although Kester contends he objected to the grant of that motion, I do not remember that he did so and the record is silent in that regard.[20] Assuming he did object, there is no merit in his position. The case had had considerable pre–trial publicity and during trial received press and radio coverage. The wisdom of hindsight shows that it was a good idea to insulate the jury from news reports. During the trial, there was a fire in an old factory building, which like Kester's warehouse, was empty. This fire received considerable press coverage and while there was no connection between it and the trial, the fact remains that if the jurors had seen newspaper articles concerning it, they may well have reacted unfavorably to the defendants. The sensitivity of the defendants to matters of this sort was demonstrated during voir dire. At that time—and at the request of one of the defendants—I asked the veniremen

> Have you, or has any member of your family or close friend ever been a fireman, or worked· for a fire department, including a volunteer fire department, for a fire marshall, or for any fire–investigating body?

Had the jurors seen the articles about the fire, which stressed the impact on the neighborhood,[21] the defendants would now be doubtless contending the jury should have been sequestered.[22]

---

**18.** Kester said at one time or another, the accident occurred on December 13 and the truck was towed in that same morning, the accident occurred on December 12 and the truck was towed in on December 13, that he had not seen the truck before lunch, that he was not sure whether he had seen it before lunch (N.T. 13–82), and that he had seen the truck before lunch after all (N.T. 13–145).

**19.** My conclusion would be the same even if Kester's motion was considered a specific, pre–trial request. The appropriate standard then is whether the suppressed evidence *might* have affected the outcome of the trial. *Agurs*, 427 U.S. at 104, 96 S.Ct. at 2398; *De Martino v. Weidenburner*, 616 F.2d 708, 710 (3d Cir. 1980); *United States v. Provenzano*, 615 F.2d 37, 47 (2d Cir.), cert. denied 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980).

With that standard as my guide, I conclude that the production of Agent Perlick's notes would not have affected the outcome of the trial. This additional finding is made in light of such cases as *United States v. Parker*, 549 F.2d 1217, 1224 (9th Cir.), cert. denied, 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977), which make it clear that it is up to the district court to assess the circumstances that exist at trial when interview notes have been destroyed.

**20.** Cassello joins in this assignment of error. I do not recall that he objected when the jury was being selected—and the record is silent in this regard.

**21.** The Philadelphia Daily News of July 30, 1979, devoted p. 5 to the story. There was a three column headline, "Fire Destroys Factory." Right above it was a picture over the caption, "Horror shows on faces of residents as they flee the fire." There were two other fire pictures on the page and an additional picture of the fire commissioner of Philadelphia on p. 14 to which the story was continued. The Philadelphia Bulletin carried the story on p. 1. Attributing its information to the fire marshall's office, it said, "the cause of last night's fire was under investigation." The Philadelphia Inquirer carried a large, three–column picture of the fire on p. 1 and featured the fact that approximately 40 nearby residents had to be evacuated from their homes during the fire. It too said that the cause of the fire was under investigation by the fire marshall's office. So far as I could ascertain the jury was not aware of the fire. (See N.T. 13–3–5).

**22.** In inquiring about the matter, counsel for one defendant said he "had some bad moments just watching the news" because so much of it was devoted to arson and fires. (N.T. 12–12).

Jury sequestration is a matter for the exercise of the district court's discretion. It is proper despite a defendant's objection. The reason for this rule is plain; the public, as well as the accused, has a substantial interest in having guilt or innocence decided by a jury free from prejudicial influences. *United States v. Haldeman*, 559 F.2d 31 (D.C.Cir. 1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Baker v. United States*, 401 F.2d 958, 968 (D.C.Cir. 1968), cert. denied, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970); *United States v. Holovachka*, 314 F.2d 345, 351–53 (7th Cir. 1963).

### C. The Mafia Comment

■ Kester also contends the entire panel should have been excused because one of the veniremen said, "It looks like the Mafia is here." (See Partial Transcript, Voir Dire, July 16, 1979, p. 5). I denied the defendants' motions but did excuse the juror who had made the offending remark. In addition, each member of the panel was immediately questioned separately to see if any of them had heard it. Only two had—and there was no motion to excuse either. One was struck by the Government; the other served as an alternate juror but did not participate in the deliberations that lead to verdicts. Having questioned all the members of the panel, I was satisfied there was no prejudice and therefore permitted the selection process to continue. See *United States v. Giacalone*, 588 F.2d 1158, 1162–64 (6th Cir. 1978), cert. denied 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979) and cases there cited. The problem is *United States v. Pantone*, 609 F.2d 675 (3d Cir. 1979), was far more serious than that in the instant case.[23] There, during a voir dire respecting potentially prejudicial publicity which circulated during the trial, one of the jurors revealed that another had said it sounded as if all the defendants were guilty. The trial judge immediately questioned the jurors, just as I did the entire panel. In refusing to find error, Judge

Gibbons speaking for the Court of Appeals said,

The judge immediately held a corrective *voir dire* during which all jurors stated that nothing had occurred which would influence the verdict or their impartiality. The trial court is obviously in a better position to observe the impact of premature jury discussions of guilt, and to make a considered judgment as to the effectiveness of a cautionary instruction. Our consideration of the entire *voir dire*, which suggests that the impact of the two remarks was rather inconsequential, and of the promptness and care with which the trial judge conducted the inquiry, convinces us that his refusal to grant a mistrial was not an abuse of discretion. Certainly the occurrence of the conversations referred to is not ground for an automatic mistrial, and no showing of any likelihood of actual prejudice has been made on this record. See *United States v. Klee*, 494 F.2d 394 (9th Cir.), *cert. denied*, 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 61 (1974).

609 F.2d at 679.

### D. Suppression of In–Court Identification

■ Kester's last allegation is that his in–court identification by Coppola should have been suppressed because there was a suggestive pre–trial photographic display. This requires consideration of two questions: first, were the photographic identification procedures impermissibly suggestive, and second, if they were, under all the circumstances did they lead to "a very substantial likelihood of irreparable misidentification" in court. *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). "Short of that point, such evidence is for the jury to weigh." *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977).

---

**23.** Moreover, the use of a word like "mafia" is not prejudicial per se. *United States v. Polizzi*, 500 F.2d 856, 888 n. 54 (9th Cir. 1974), cert. denied, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975).

■ At a hearing required by Kester's motion to suppress, Coppola testified that in May, 1977, he and Turchi met the owner of the Orthodox Street warehouse. He described him as being short, old, light hair, dark glasses, and heavy set. Coppola then identified Kester as being that man. On cross-examination, Coppola explained he and Turchi had gone to the warehouse at Morrone's direction to get $5,000. that the owner would have for them. They arrived in late morning or early afternoon, three days before the fire. The man they met was waiting on the second floor, approximately 20 feet from a window which Coppola estimated to be about four feet by eight feet. While Turchi talked to the man, Coppola walked around the second floor looking at the building. He was as far as 50 feet from the man–and also right next to him. He described the lighting as "bright enough to see around there." At one point, Turchi called him over, handed him a brown paper bag, and told him to count the money in it. He did so. Coppola said he looked at the man directly, had a good, clear look at him, and the light was bright enough to see the man. The three of them were on the second floor together for about 15 minutes. Coppola never saw him again until Agent Perlick showed him a group of photographs in October or November, 1978.[24]

Agent Perlick said he interviewed Coppola in February, 1979, at which time he displayed a spread of photographs and asked Coppola to identify anyone that he could. Coppola recognized several, and as to one of Kester, said it "looked like the individual who owned the Orthodox Street building that he and Turchi met with." The photographic display which Perlick showed Coppola contained 17 pictures, eight of which were of individuals connected in some way with this case. None of them, except the one of Kester, were of a person who would have matched his physical description. My first consideration, therefore, was whether the photographic display was impermissibly suggestive as to Kester. Accordingly, I

took into account that Coppola was shown 17 pictures and was told to select all persons whom he knew. This was not the customary line–up type display where someone is asked to recall an observation made during an emotionally charged event of limited duration and asked to identify a person who victimized him. Here, Coppola's attention was not directed to the Orthodox Street fire, or to the possibility that a picture of the man he said he saw at the warehouse might be among the group, or for that matter, to any specific incident. Coppola had been involved in other fires and the ATF investigation was not limited to the events which preceded one arson but also related to matters which post–dated the fires. It is true that Coppola's own pictures were among the group as were those of persons whom he knew well, including other defendants in this case. It is also true, however, that one of the pictures was that of William Fox, whom Coppola had never seen, and Coppola made no identification of him. Based on all of these factors, I decided that the show of photographs did not suggest to Coppola that he should select the one of Kester and identify him as being the owner of the building.

Next I considered the lighting in the warehouse, the fact that Kester wore no mask, the 15 minutes during which Coppola could observe Kester, the distance Coppola was from Kester, the absence of any obstructions to his vision, the fact that he was paying attention to Kester, the description he gave of Kester, the degree of Coppola's confidence in his identification, and the fact that there had been no prior failure to identify.

I also took into account, however, that there were certain differences between the way Coppola expressed himself before me and the way he stated matters to the Grand Jury. For example, before the Grand Jury he said the warehouse was vacant and dark and that he "did not get a real clear look at the owner because of the darkness. How-

---

**24.** In response to a question from the Government, Coppola also said he saw the pictures in

February, 1979.

ever, I did observe that he was a grey–haired old man, possibly in his 60s, fairly short, heavy set and I believe he wore glasses." (N.T. 3–48). In his testimony before me, he said that the light was bright enough for him to identify Kester. There were certain discrepancies between his testimony and that of Agent Perlick as to the number of photographs he saw and when he saw them. Coppola also said that the picture he saw did not refresh his recollection as to the man he had seen in the warehouse (N.T. 3–49) and that it did not influence his ability to identify Kester in court (N.T. 3–7).[25] From all these circumstances, I conclude that even if the photographic display had been impermissibly suggestive, the Government's clear and convincing evidence showed there was an independent origin for the in-court identification. See *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *United States v. Zeiler*, 447 F.2d 993 (3rd Cir. 1971).

Having considered the totality of the circumstances (N.T. 3–58–62), I determined that there was little chance that the events described to me would have lead to an irreparable misidentification in court. See *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *United States v. Coades*, 468 F.2d 1061 (3d Cir. 1972).

I therefore refused the motion to suppress. There was no error.[26]

### III. Cassello's Additional Argument

▇ In Counts 10 through 17 of the indictment, Cassello was charged with mail fraud growing out of the Blue Bell Bar fire. Count 18 charged him with racketeering while Count 19 alleged conspiracy to engage in racketeering activities. The predicate offenses charged in the last two counts were Cassello's participation in the Blue Bell Bar arson and the arson at the Archway Tavern. Cassello contends that since he was found not guilty of mail fraud and since two predicate offenses must be established to support a conviction of racketeering or racketeering conspiracy, his convictions on Counts 18 and 19 must be set aside.

Cassello is wrong. His being cleared on the mail fraud charges cannot be interpreted as a finding he was not guilty of arson. Under the indictment and my charge to the jury the two offenses did not go hand in hand.[27] I specifically told the jurors that to warrant the conviction of any defendant on a mail fraud count they, the jurors, had to be convinced beyond a reasonable doubt of the existence of the scheme described in the indictment, that the defendants were charged with mail fraud not arson, and that since the scheme alleged involved the knowing participation by William Fox, if he was not guilty of mail fraud that none of the defendants could be guilty of it. (N.T. 15–51, 54, 62, and 63) Obviously the jury could

---

**25.** At trial, the Government did not seek to bolster Coppola's in–court identification by any reference to his selecting Kester's photograph. The matter was explored, however, on cross-examination.

**26.** Although he filed no formal motion to this effect, Kester in his brief contends he should have been given more time to assert additional legal arguments. However, he took no exception to my order of August 10, 1979, which allowed him ten days after the notes of testimony were filed by the court reporter to state additional reasons in support of his post–trial motions and file his brief. The Clerk's docket shows that the notes were filed on February 28, 1980. No request was made by Kester for additional time until, by letter dated March 3, 1980, counsel asked that the ten days allowed by my order of August 10, 1979, not commence

until he had actually received all the notes of testimony. The court reporter's records show that counsel had received all the notes by March 5. Kester's brief was filed on March 24, 25 days after the reporter filed the notes of testimony and 19 days after Kester in fact had them. Because a question arose as to Turchi's representation, oral argument had to be deferred until June 6, 1980. Correspondence shows that all counsel were fully aware of this problem, but no formal or informal request was made during the interim to file anything else on Kester's behalf.

**27.** Even if they had, consistency in verdicts is not required. *Hamling v. United States*, 418 U.S. 87, 101, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974).

have been convinced that Cassello partici-
pated in the actual arson but may not have
been convinced that he participated in the
scheme which the indictment described.
For example, the bill of indictment alleged
that Fox had procured the burning of the
bar. The jury may have concluded that
without Fox's knowledge, his wife had
made the arrangements or that Harry Bas-
sion had done so. Under those circumstanc-
es, the Government would not have estab-
lished the scheme it charged and the jury
could not have found Cassello guilty of mail
fraud.

### IV. Conclusion

The defendants raised many other rea-
sons in support of their motions, but did not
consider them worthy of briefing or oral
argument. Neither do I.

Finding no merit in any of the reasons
advanced by the defendants, I conclude
their motions for post–trial relief must be
refused.

### APPENDIX

### ORDER SUR MOTION OF MODER-
WELL L. KESTER TO SUPPRESS
STATEMENT

AND NOW, this 21st day of June, 1979,
after hearing, the pre–trial motion of Mod-
erwell L. Kester to suppress a statement is
hereby refused, the court having concluded
that it was made voluntarily. In connec-
tion with this order, the court makes the
following findings:

(1) On December 13, 1977, Agent Harold
C. Parlick and Agent Piccirilli, both of the
Bureau of Alcohol, Tobacco and Firearms,
went to the office of Moderwell L. Kester
at approximately 4:30 P.M.

(2) Agents Parlick and Piccirilli identi-
fied themselves and then had a conversation
with Mr. Kester during the course of which
they told him that they were investigating
an arson at a building he owned. They
showed him certain photographs of a group
of individuals, but he denied knowing any
of them. They also told him that they
thought the fire in question had been pro-
fessionally set, that they knew who the
arsonist was, and that they could link him

to that person. They also told Mr. Kester
that since they were investigating an arson
ring, they would make any cooperation on
his part known to the court, although they
could make no promises to him.

(3) The agents delivered a subpoena to
Mr. Kester, requiring his testimony before
the Grand Jury.

(4) Thereafter, Mr. Kester made the al-
legedly incriminating statements.

(5) Although the defendant had been
drinking earlier in the afternoon, he spoke
in a normal fashion to the agents, was
coherent, logical, and reacted appropriately
to what they said.

(6) Mr. Kester's will was not weakened
by alcohol so as to be overborne by the
officers and he did not speak to them invol-
untarily. He testified that sometimes when
he has as much to drink, as he had had on
December 13, 1977, he says things that he
should not say. He also said that the
agents put words in his mouth and that he
told them what he thought they wanted to
hear. However, none of these statements,
singly or in concert, amounted to a credible
statement on his part that his will had been
overborne by the agents or that he spoke
involuntarily.

(7) On three separate occasions when the
agents started to leave, Mr. Kester stopped
them so that he might continue to talk with
them.

(8) During the time that he spoke with
the agents, Mr. Kester was not in custody,
he was not under arrest, his freedom of
movement was not restricted in any way,
and he did not say that he did not wish to
speak to the agents. Although at one point
he spoke of the fact that he did not wish to
give them further information without
talking with his attorney, prior to that time
he did not say that he wished to speak to
his lawyer and thereafter, the agents asked
him no more questions.

(9) At no time was Mr. Kester given the
warnings required in *Miranda v. Arizona*,
384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694
(1966).

(10) Mr. Kester was not subjected to cus-
todial interrogation because he had not

been taken into custody or otherwise deprived of his freedom of action in any significant way.

(11) "... [P]olice officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the stationhouse, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody'. It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). (emphasis in original).

(12) The statements of Mr. Kester were made voluntarily. In making this determination, I have considered all of the circumstances surrounding the giving of the statement as well as the specific factors enumerated in 18 U.S.C. § 3501(b). In this regard, the time between arrest and arraignment is not applicable, the defendant knew the nature of the offense of which he was suspected at the time, and he knew that he had the right to the assistance of counsel, although he had not been advised of that fact. He was not advised, and he may not have known, that he was not required to make any statement and that any such statement could be used against him, and he was without the assistance of counsel during the period of his conversation with the agents.

(13) Insofar as the testimony of Agent Parlick and Mr. Kester differed, I accept that of Agent Parlick. Mr. Kester was forgetful, evasive, and not credible. In addition, statements he made differed from prior statements which he had given under oath.

BY THE COURT:
J. William Ditter, Jr.