David JARRELL, Petitioner-Appellant,

v.

Charles BALKCOM, Warden,
Respondent-Appellee.

No. 83–8535.

United States Court of Appeals,
Eleventh Circuit.

June 20, 1984.

Rehearing and Rehearing En Banc
Denied July 27, 1984.

J.M. Raffauf, Decatur, Ga., for petitioner-appellant.

Mary Beth Westmoreland, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before HILL and CLARK, Circuit Judges, and LYNNE [*], District Judge.

CLARK, Circuit Judge:

Petitioner is a Georgia prisoner seeking habeas corpus relief under 28 U.S.C. § 2254. We have jurisdiction. *Id.* § 2253.

## I. BACKGROUND

On Christmas Eve, 1973, Mrs. Mala Still disappeared. She had left work at 1:15 p.m. and was last seen alive buying groceries shortly thereafter in a Lawrenceville shopping center. Mrs. Still's car was observed parked alongside Georgia Highway 20 at approximately 8:00 p.m., but at that time the police had not been notified of her disappearance. The authorities located the automobile at about midnight.

On December 25, 1973, various articles of Mrs. Still's apparel and other personal property were found scattered and buried along Tribble Mill Road. On December 26, 1973, the victim's body was discovered about 15 feet off of Tribble Mill Road; she had been shot with a .45 caliber pistol three times in the head and back. When found, the victim's body was fully clothed. At the autopsy, however, pine straw, leaves and other particles were found between her clothing and back.

[*] Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

An investigation ensued, and the authorities interviewed hundreds of possible witnesses. A composite drawing was prepared and published in a local newspaper. The victim's family and employer offered a reward.

On January 4, 1974, Mrs. Joan Pruitt telephoned the Gwinnett County Police and reported a threatening telephone call she had received. The police advised her to secure her husband's .45 caliber pistol. When she attempted to retrieve the pistol, she discovered that it was missing. Mrs. Pruitt said that she had last seen the pistol on December 21, 1973 in the petitioner's possession.

On January 5, 1973, the police interviewed petitioner. After advising petitioner of his rights, the police told him that they wanted to discuss the Still case. Initially, petitioner denied knowledge of the murder, but began to express concern that the victim's husband might seek revenge on the perpetrator. Petitioner then confessed to the crime. He admitted stealing the gun from the Pruitts, kidnapping Mrs. Still in her car from the shopping center, forcing her to remove her clothes, shooting her, throwing things from the car as he drove away from the scene, cleaning the car with Ajax cleanser and later selling the gun to a Bobby Cannon. Petitioner subsequently reenacted the crimes and identified the place where the holster for the pistol would be found. Sometime between 6:00 and 7:30 p.m., petitioner's statement was reduced to writing. At about dark, petitioner was verbally advised that he was under arrest for murder, kidnapping, armed robbery and aggravated assault, and a signed warrant for his arrest was obtained from a justice of the peace.

Ballistics tests revealed that the .45 caliber pistol petitioner sold to Cannon was the murder weapon. Petitioner's fingerprint and palmprint were identified from an item thrown from the victim's automobile and picked up by a passerby on Tribble Mill Road. Petitioner had also been seen walking between his home and the shopping center at noon on Christmas Eve and in the possession of the victim's automobile before 5:00 p.m. that afternoon.

At trial, petitioner's defense was an alibi. Petitioner did not deny making the confession, but stated that he did not remember making it and denied all knowledge of the murder. He testified that he left his residence about 3:30 p.m. on the day of the murder, found the victim's car with its door half open and the keys in it, drove the car for approximately an hour, and then parked it at or near the place he had found it. Explaining his possession of the pistol, he stated that he had taken the gun from the Pruitts' residence on Christmas Day, the day after the victim's death.

On March 8, 1974, petitioner was convicted and received three death penalties and a ten-year sentence. The day of execution was fixed for June 7, 1974. On direct appeal, the Supreme Court of Georgia vacated the death penalty for the armed robbery offense, but affirmed the convictions and remaining sentences. See Jarrell v. State, 234 Ga. 410, 216 S.E.2d 258 (1975). The United States Supreme Court denied certiorari. 428 U.S. 910, 96 S.Ct. 3223, 49 L.Ed.2d 1218 (1976). On May 12, 1978, state habeas corpus relief was denied by the Superior Court of Tattnall County, and the Supreme Court of Georgia affirmed the denial. Jarrell v. Hopper, 242 Ga. 617, 250 S.E.2d 446 (1978).

On March 25, 1979, petitioner's former counsel instituted a federal habeas corpus petition and a stay of execution was entered. On June 13, 1980, the magistrate recommended denial of relief, but on July 19, 1980 the defendant obtained new counsel and was granted leave to amend the petition. The instant action was then stayed pending exhaustion of state remedies.

On September 26, 1980, petitioner filed a second state habeas petition in the Superior Court of Butts County, which was dismissed as successive. On appeal, the Supreme Court of Georgia found 19 of the 22 allegations for relief to be successive, moot or without merit, but the court addressed the remaining three issues on the merits.

Petitioner's death sentence for murder was vacated because of an improper jury charge on aggravating circumstances. *Jarrell v. Zant*, 248 Ga. 492, 284 S.E.2d 17 (1981). Furthermore, the trial court was directed either to resentence defendant or to enter a life sentence. Because the instant pending action challenges petitioner's convictions, no sentencing trial has been scheduled.

Following petitioner's exhaustion of state habeas remedies, respondent filed an answer to the amended federal habeas corpus petition. On March 10, 1983, the magistrate recommended that a new trial be granted because of the improper charge to the jury on petitioner's alibi defense. On June 1, 1983, the district court rejected the recommendation and directed that relief be denied on all grounds.[1] The court granted a certificate of probable cause and leave to proceed in forma pauperis. On July 11, 1983, petitioner timely filed a notice of appeal to this court.

## II. OPINION

In this appeal, petitioner raises numerous grounds for relief. Facts will be developed as relevant to the specific issue addressed.

### A. *The Confession*

On Saturday, January 5, 1974, Jarrell was arrested for and confessed to the murder of Mala Still. The relevant facts leading up to the confession commence on that Saturday morning. Jarrell and his friend, Haney, were drinking, smoking marijuana, and driving around in Haney's automobile. The city police stopped Haney for a traffic violation, and asked Haney and his passenger, Jarrell, to come down to City Hall. Both Haney and Jarrell agreed to go to City Hall, but only Haney was placed under arrest by the city for a traffic violation. (T.T. 441, 462).[2]

At about 1 p.m., City Chief of Police Plunkett telephoned Sergeant Blannott of the Gwinnett County Police Department and told him that Jarrell was at City Hall. (T.T. 464, 537). Between 1:00 and 1:30, Sergeant Blannott sent the officers investigating the Still case, Bishop and Cox, to City Hall to ask Jarrell to come to the Gwinnett County Police Headquarters (hereinafter "Headquarters"). (*Id.*, T.T. 473). Investigators Bishop and Cox arrived at City Hall at approximately 1:30, and Chief Plunkett informed them that Jarrell was in his office. (T.T. 473). Upon finding Jarrell in the Chief's office, Bishop carefully advised petitioner of his rights. After each point in the *Miranda* warnings, Jarrell indicated that he understood the rights explained. (T.T. 450, 499). The investigators then told Jarrell that his name had come up in their investigation of the Still case, and they asked him to come to Headquarters for questioning. Jarrell was not arrested, and he agreed to go to Headquarters voluntarily.[3] (T.T. 451–53, 464, 467). The investigators observed that Jarrell appeared to be in full control of his faculties. (T.T. 451–52, 467).

Cox and Bishop left City Hall with Jarrell and Haney in a police car sometime after 1:30 p.m. (T.T. 443–47, 467). Upon arriving at Headquarters, Jarrell was separated from Haney, and Bishop escorted Jarrell to the Headquarters' Detective Division and left him with Sergeant Blannott. (T.T. 468). At that time and within three or four feet of petitioner, Blannott asked Bishop if he had given Jarrell his *Miranda* warnings. Bishop told Blannott that he had done so at City Hall. (T.T. 545). Therefore, Blannott did not advise Jarrell of his rights before questioning him.

Between 1:30 and 1:45 p.m., Blannott questioned Jarrell about the Still case. (T.T. 538). Jarrell denied any knowledge of the Still murder. (T.T. 517). After about

---

1. Because petitioner's counsel was not notified of this decision, judgment was reentered on July 11, 1983.

2. T.T. refers to Trial Transcript.

3. Bishop testified that, if Jarrell had refused to go to Headquarters, he would have telephoned Sergeant Blannott to ascertain whether probable cause to arrest Jarrell without a warrant existed. (T.T. 466).

20 to 25 minutes of questioning, Blannott decided to take Jarrell to the District Attorney's office for a polygraph examination. (T.T. 492).[4] Bishop and Blannott drove Jarrell to the District Attorney's office for the polygraph examination and they arrived at about 2:30 p.m. (T.T. 583). They stayed at the District Attorney's shortly over one hour. (T.T. 518, 539). Jarrell still had not been arrested. (T.T. 518).

Between 3:30 and 4:00 p.m., Blannott, Bishop and Jarrell returned to Headquarters in an unmarked police car. (T.T. 498). They were riding along quietly when, "out of the blue sky" Jarrell asked if the husband of the dead girl would kill the person who had killed her (T.T. 468, 470, 496, 519). Blannott said that when that person was caught he would be offered police protection and that no harm would come to him, just as with any other defendant (T.T. 498, 519).

Upon returning to Headquarters, Bishop, Blannott and Jarrell went to a private room. (T.T. 470). Blannott then placed Jarrell under arrest verbally without a warrant. (T.T. 511, 520). No *Miranda* warnings were given because Bishop had advised petitioner of his rights 2½ hours earlier. (T.T. 499, 544). Following the arrest, at about 4 p.m. Blannott resumed his interrogation of Jarrell. (T.T. 482, 520). After about 30 to 45 minutes of Blannott's questioning, petitioner began to confess (T.T. 521), and he eventually acknowledged his involvement in every facet of the crime. (T.T. 470–72). At one point during the giving of his confession, Jarrell said that he was sick and wondered what would happen to him and if he would get competent medical help. The officers understood him to mean that he was mentally sick. Blannott told him that as far as he knew, he would get mental help if it was needed. The officers did not condition such medical attention upon the giving of any statement (T.T. 483–84, 489, 520).

Blannott's second interrogation of Jarrell lasted approximately one hour. (T.T. 542).

After obtaining the confession, Blannott drew up a warrant for Jarrell's arrest at approximately 5:30 p.m. (T.T. 550). Blannott then asked Jarrell to reenact the crime, which petitioner agreed to do. Darkness fell as petitioner reenacted the murder (T.T. 523), and Jarrell returned to Headquarters with Blannott at approximately 7:30 p.m. Blannott then sent out for some food for petitioner, and Jarrell's confession was reduced to writing while petitioner ate. (T.T. 547–48). By 8 p.m., the written confession was completed. Petitioner then signed the confession, and a warrant for his arrest was obtained from a justice of the peace. (T.T. 488, 550).

Petitioner asserts several grounds for the confession's inadmissibility.

### 1. *Illegal Arrest*

Petitioner contends that his confession was the product of an illegal arrest and was therefore inadmissible under *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In *Dunaway*, petitioner was "picked up" after a police detective obtained a "lead" implicating petitioner in the crime but supplying insufficient information to support a warrant for petitioner's arrest. Petitioner was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. The police never informed him that he was "free to go" and, had he refused to accompany the officers or tried to escape, he would have been physically restrained. After giving petitioner his *Miranda* warnings, the police began questioning him. Petitioner waived counsel and eventually made statements and drew sketches that implicated him in the crime. The Supreme Court found that this custodial interrogation triggered the traditional fourth amendment safeguards against illegal arrest, and, therefore, had to be supported by probable cause. Accordingly, the Court held that the police violated petitioner's constitutional rights when, without probable cause, they seized him and transported him to the police station

---

**4.** The results of the examination were inconclusive because petitioner terminated the examination before it was completed. Federal Habeas Transcript (F.H.T.) at 151–52.

for interrogation. 442 U.S. at 216, 99 S.Ct. at 2258. Furthermore, the Court determined that the connection between this unconstitutional police conduct and the incriminating statements and sketches obtained during petitioner's illegal detention was not sufficiently attenuated to permit their use at trial. 442 U.S. at 216–19, 99 S.Ct. at 2258–60.

■ We find the instant case distinguishable from *Dunaway*. The Supreme Court in *Dunaway* found that "the detention of petitioner was in important respects indistinguishable from a traditional arrest." 442 U.S. at 212, 99 S.Ct. at 2256. From the time petitioner left City Hall until the time he returned from the District Attorney's office, Jarrell voluntarily accompanied the attending officers. There were no indicia of an arrest. Thus, no *Dunaway* issue arose until Bishop, Blannott and petitioner returned to Headquarters and Blannott verbally informed Jarrell that he was under arrest. *See United States v. Huberts*, 637 F.2d 630, 636–37 (9th Cir.1980) (no *Dunaway* violation without detention).[5] When Blannott told Jarrell that he was under arrest, however, petitioner's detainment was no longer voluntary. Thus, if, at the time Blannott began his second interrogation of Jarrell, no probable cause existed, then petitioner's confession was inadmissible as the product of an illegal arrest.[6] A warrantless arrest is supported by probable cause if the arresting officer, at the time of arrest, had reasonable grounds to believe that a felony was being, or had been, committed and that the person to be arrested participated in that felony. *See* L. Orfield, *Criminal Procedure under the Federal Rules*, § 4:59 (1966). In the instant situation, the arresting officer, having observed the results of the offense, knew that a felony had been committed. *See* LaFave, *supra*, note 6, at 257 ("Police often are certain that a felony has been committed because they directly observe the offense, or the results of the offense ..."). Thus, the only question in this case is whether Sergeant Blannott had probable cause to believe that petitioner had committed the felony. We find that this second prong of the probable cause inquiry is satisfied.

■ First, the ballistics tests revealed that the murder weapon was a fairly unique, older .45 caliber revolver, and Sergeant Blannott had information from Mrs. Pruitt that petitioner was the last person in possession of a firearm her husband owned which met that description. Blannott also knew that Jarrell had sold the Pruitts' gun to Bobby Cannon sometime after the day of the murder. Secondly, Blannott knew that the victim's car had been found less than one-half mile from Jarrell's residence and that petitioner resided within 1.1 miles of the shopping center from which the victim was abducted. Thirdly, Blannott knew that the facts of Jarrell's previous aggravated assault with the intent to rape conviction closely paralleled those of the Still case; he had accosted his victim in a public place, taken her at gunpoint to a wooded area, forced her to disrobe, but did not

---

**5.** Pre-*Dunaway* decisions also held that a confession was not the product of an illegal arrest if the suspect was not detained against his will. *See United States v. Brunson*, 549 F.2d 348, 358 (5th Cir.1977); *United States v. Brown*, 425 F.2d 1172, 1174 (9th Cir.1970).

**6.** It should be noted that Blannott told Jarrell that he was under arrest before petitioner confessed but did not draw up the arrest warrant until after the confession. The fact that Blannott placed Jarrell under arrest verbally before obtaining an arrest warrant from the magistrate is not improper under the circumstances of this case. The Supreme Court has made clear that so long as the police do not offend the sanctity of the dwelling unit, *see Payton v. New York*,

445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), a warrantless arrest supported by probable cause is proper, even if the arresting officer had an adequate opportunity to obtain an arrest warrant beforehand. *See United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). *See also* Wright, *Federal Practice and Procedure: Criminal 2d*, § 77 at 161–62 ("An arrest may be made in a public place without a warrant even though the circumstances are such that it would have been practicable to obtain a warrant."); W. LaFave, *Arrest: The Decision to Take a Suspect into Custody*, 20–21 (1966). Jarrell's arrest in the police Headquarters is governed by *Watson*, not *Payton*.

engage in intercourse. Finally, while returning from the District Attorney's office, Blannott heard Jarrell express concern about what the victim's husband might do to the perpetrator of the crime. In our view, these circumstances support a finding of probable cause. Therefore, we hold that Jarrell's confession was not tainted by an illegal arrest.

### 2. *Unlawful Inducement*

In *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), the Court made clear that confessions induced by promised benefits are inadmissible:

> [A] confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats of violence nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence....

*Id.* at 542, 18 S.Ct. at 186. Petitioner contends that the *Bram* principle was violated by the officers' alleged promises of medical (mental) help and protection from the victim's vengeance-seeking husband. Our examination of the facts underlying these claims and of *Bram*'s progeny, however, compels us to reject petitioner's contentions.

#### a. Mental Assistance

■ During his confession, petitioner suggested to the officers that he was mentally sick and inquired whether he would receive competent medical help. Without conditioning medical treatment upon the giving of a statement, one of the officers responded that, as far as he knew, petitioner would receive such assistance if needed. Petitioner contends that this scenario constitutes an illegally induced confession rendering Jarrell's statement inadmissible. We disagree.

In *United States v. Hollis*, 450 F.2d 1207 (5th Cir.1971), defendant confessed while suffering pain and discomfort from narcotics withdrawal symptoms. Defendant contended that the confession was inadmissible because his statements were made in exchange for promised medical treatment for those symptoms. Rejecting this contention, the former Fifth Circuit found the confession voluntary and therefore admissible. The court noted that, while experiencing some discomfort, defendant was lucid, and, although the officers "inquired as to how he was feeling," they did so only after defendant had specifically requested meeting with them. *Id.* at 1208–09.

When compared with *Hollis*, the facts of the instant case convince us that petitioner's confession was voluntary. In *Hollis*, the defendant requested the meeting, but the officers initiated the line of questioning. In the instant case, Jarrell consented to a meeting initiated by the officers, and defendant, not the police, initiated the line of questioning concerning mental treatment. These circumstances are even less suggestive of an illegally induced confession than those in *Hollis*. Furthermore, as in *Hollis*, petitioner was in control of his faculties while confessing.[7] Accordingly, we find no promised benefit inferable from the officer's correct response to petitioner's direct question about mental treatment that would render the confession involuntary and inadmissible.

#### b. Police Protection

■ Before actually confessing to the crime, petitioner expressed some concern that the victim's husband would seek revenge against her murderer. When Jarrell asked if the husband of the murdered woman would kill the person who had killed her, one of the officers responded that, when apprehended, the perpetrator would be of-

---

**7.** Although petitioner consumed alcohol and smoked marijuana before confessing, his mental faculties do not seem to have been impaired. Testimony reveals that a significant amount of time elapsed between his drinking and his confession to the police; petitioner and his friend had consumed alcohol the night before the ques-

tioning, and had had a full night's sleep. Furthermore, while petitioner and his friend had consumed two marijuana cigarettes that morning, his friend testified that he noticed no effect on petitioner from alcohol or marijuana. F.H.T. at 103.

fered police protection. Petitioner contends that this response was a promise of a benefit which rendered the confession involuntary.

We view the alleged promise in the instant case as nothing more than a direct response to the suspect's expressed concerns about retaliation from the victim's relatives. To the extent that the officer's response can even be characterized as a "promise," it was made at the petitioner's initiation, not instituted by the police. Consequently, applying the exclusionary rule would be inappropriate; the officer's statement was neither likely to nor intended to induce confession. *See* W. Ringel, *Searches and Seizures, Arrests and Confessions*, § 25.2(c) n. 42 (1983). We conclude that petitioner's discussion with the police about protection did not render the confession involuntary.

### 3. *Voluntariness Hearing*

Petitioner argues that his confession was inadmissible because the trial court failed to conduct a full and fair voluntariness hearing before admitting the confession. Before addressing the merits of this claim, we must consider whether petitioner had a full and fair opportunity to present this claim to the state courts and is therefore precluded from asserting it in this federal habeas proceeding.

### a. Waiver

Under *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), fourth amendment claims cannot be asserted in a federal habeas petition if the petitioner had a full and fair opportunity to raise the claims in a state court proceeding. Whether *Stone*'s waiver principle extends to fifth amendment claims is unclear. The Supreme Court in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), for example, left open the question whether *Stone* precluded federal habeas

review of a *Miranda* claim. *Id.* at n. 11. Some courts considering the *Sykes* issue have noted the similarities between the fourth amendment exclusionary and fifth amendment *Miranda* rules. One authority observes that:

> The *Miranda* rule is a judicially created remedy to safeguard the privilege against self-incrimination, just as the exclusionary rule is a judicially created remedy to deter future unlawful police conduct in regard to searches and seizures. With both rules, the evidence that is excluded is often reliable and probative of the issue of guilt or innocence. *U.S. ex rel. Henne v. Fike*, 563 F.2d 809 (7th Cir.1977), *cert. denied*, 434 U.S. 1072 [98 S.Ct. 1257–58, 55 L.Ed.2d 776] (1978). Therefore, it could well be only a matter of time before *Stone v. Powell*'s opportunity requirement will also be used for habeas claims based on alleged *Miranda* rule violations.

Ringel, *supra*, § 21.3(a) at 21–16. Despite these similarities, extension of *Stone* beyond its fourth amendment roots would be a major departure from established case law. *Id.* § 30.2(d) at 30–10. Consequently, most courts confronting the issue, including an en banc decision of the former Fifth Circuit,[8] have not extended *Stone* to deny federal habeas review of *Miranda* claims. *See White v. Finkbeiner*, 687 F.2d 885 (7th Cir.1982); *Henne, supra*, 563 F.2d 809.[9]

In the instant case, respondent contends that *Stone* precludes petitioner from claiming in a federal habeas proceeding that the trial court failed to conduct an adequate hearing on the voluntariness of petitioner's confession. The voluntariness hearing requirement was established in *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Although both decisions protect fifth amendment rights,[10] *Jackson* predated *Miranda* and

---

**8.** *Harryman v. Estelle*, 616 F.2d 870, 872 n. 3 (5th Cir.1980) (en banc).

**9.** For the list of cases in other contexts refusing to extend *Stone* beyond its fourth amendment

roots, *see Finkbeiner, supra*, 687 F.2d at 885 n. 14.

**10.** These fifth amendment rights are, of course, made applicable to the states through the fourteenth amendment.

raises an issue distinct from the *Miranda* question in determining a confession's admissibility. Thus, even if a court finds compliance with *Miranda*, the court must still rule on the confession's voluntariness.[11] While *Miranda* bears certain similarities to the exclusionary rule which may justify extension of *Stone* to fifth amendment *Miranda* claims,[12] no such similarities exist between an involuntary confession and inadmissible evidence under the exclusionary rule. Evidence excluded under fifth amendment *Miranda* claims and the fourth amendment exclusionary rule may very well be reliable and probative;[13] however, an involuntary confession is inherently unreliable. *See* Ringel, *supra*, at 24-4 (citing *Ward v. Texas*, 316 U.S. 547, 555 n. 2, 62 S.Ct. 1139, 1143 n. 2, 86 L.Ed. 1663, 1667 n. 2 (1942), and *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936)). For these reasons, and because neither this circuit[14] nor the Supreme Court[15] have even extended *Stone* to *Miranda* claims, we decline to extend *Stone* to *Jackson v. Denno* claims. Accordingly, we now address the merits of petitioner's voluntariness claim.

b. The Hearing

At trial, three witnesses testified as to petitioner's confession. When the testimony of the first of these three witnesses,

Officer Cox, began to touch on the specifics of petitioner's confession, the court, at defense counsel's request, retired the jury and held a hearing, as required by *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). During this hearing, Officer Cox described the reading of the *Miranda* rights to petitioner. (T.T. at 440–49). Finding that Officer Cox's testimony revealed no evidence of an inculpatory statement, the court determined that a preliminary ruling as to the voluntariness of any confession was unnecessary at that point. *Id.* at 449. Later, Detective Bishop testified and the jury was again excused at defense counsel's request. Following the detective's testimony, defense counsel moved to exclude the confession because of the illegal inducements discussed in Part A.2, *supra*. Rejecting this motion, the court found on the basis of the hearing that petitioner's confession was voluntary and allowed Detective Bishop to testify. (T.T. at 494).[16] Petitioner contends that this ruling was error because the court denied petitioner the opportunity to rebut the government's prima facie showing of voluntariness out of the presence of the jury.

■ Unquestionably, a voluntariness hearing must afford the defendant an opportunity to testify regarding the inculpa-

---

**11.** *United States v. Sims*, 719 F.2d 375, 378 (11th Cir.1983), *cert. denied*, slip op. — U.S. —, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984). That the voluntariness and *Miranda* issues are separate is made clear by the Supreme Court's recognition that, "under *Miranda*, the cost of assuring voluntariness by a procedural test, independent of any actual inquiry into voluntariness, is that some voluntary statements will be excluded." *Michigan v. Mosley*, 423 U.S. 96, 113, 96 S.Ct. 321, 331, 46 L.Ed.2d 313, 327 (1975) (Brennan, J., dissenting) (paraphrasing majority opinion). *See generally* Ringel, *supra*, § 24.3, § 24.5 and § 30.2.

**12.** *See* Ringel, *supra* at § 21.3(a).

**13.** *Id.*

**14.** *See* note 7 and accompanying text, *supra*.

**15.** Chief Justice Burger discussed the application of *Stone* to fifth amendment *Miranda*

claims in *Brewer v. Williams*, 430 U.S. 387, 423–28, 97 S.Ct. 1232, 1252–54, 51 L.Ed.2d 424, 452–55 (1977) (Burger, C.J., dissenting), but the majority declined to so extend *Stone*.

**16.** Following Cox and Bishop, Sergeant Blannott also testified as to Jarrell's confession, but defense counsel made no request for a voluntariness hearing. Georgia procedure requires that the defendant's objection to the admission of a confession be made at trial or not at all. *See Mayo v. State*, 132 Ga.App. 217, 207 S.E.2d 697, 698 (1974). *See also Ray v. State*, 147 Ga.App. 529, 249 S.E.2d 338, 339 (1978). Thus, this procedural default bars federal habeas review absent a showing of "cause" and "prejudice." *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594, 607 (1977). Because Bishop's testimony alone adequately covered the confession, we find no actual prejudice, and petitioner has asserted none, that would warrant review of any alleged error in admitting Blannott's subsequent testimony.

tory statement out of the jury's presence without prejudice to his right not to take the stand in his defense. *See United States v. Carignan*, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48 (1951); *United States v. Feinberg*, 383 F.2d 60, 69 (2d Cir.1967). *See also* 2 Wright, *Federal Practice and Procedure* § 414 n. 25 (2d ed. 1982). This rule does not, however, require that the trial court base its voluntariness determination upon the testimony of both the prosecution and the defense; such a determination is sufficient if based on the *opportunity* to present testimony should the defense choose not to present rebuttal evidence. *See Bray v. United States*, 306 F.2d 743, 750 (D.C.Cir.1962). The focus of our inquiry, therefore, is whether the absence of rebuttal testimony in the instant case reflects a denial of petitioner's opportunity to present such evidence.

■ A trial court commits reversible error in *refusing* to permit the defendant to testify in the absence of the jury to facts which might indicate the involuntariness of a confession. *Carignan, supra*, 342 U.S. at 38, 72 S.Ct. at 98–99, 96 L.Ed. at 50–52. Furthermore, even where the court does not refuse to hear defendant's evidence but *offers* the defendant an opportunity to rebut, the hearing is inadequate if the circumstances indicate that, despite the offer, the court has effectively denied defendant the opportunity to present evidence. *Schaffer v. United States*, 221 F.2d 17, 20–22 (5th Cir.1955) (offer merely perfunctory; court had already determined that the confession was admissible). In the instant case, the trial judge did not refuse outright defendant's attempt to proffer evidence; therefore, we evaluate the circumstances to determine whether such an opportunity was denied.

■ The circumstances of this case do not indicate that petitioner was denied the opportunity to present rebuttal evidence. Unlike the *Schaffer* case, defendant in the instant case made no attempt to present rebuttal evidence nor made any offer of proof as to the involuntariness of the confession. Defense counsel did, however, conduct an extensive cross-examination of Detective Bishop, particularly concerning alleged promises which might have induced the confession. The trial judge also vigorously cross-examined Detective Bishop, and none of the detective's testimony was heard by the jury concerning the confession until after the trial judge heard such testimony and specifically ruled that the confession was voluntary. Furthermore, the testimony presented to the jury by the two other witnesses to the confession did not contradict the testimony of Detective Bishop. Finally, during his own testimony, petitioner did not testify that the confession was involuntary; rather, he maintained that he remembered nothing from the time he was picked up until two days later. We conclude that these circumstances reveal nothing that would have prevented defendant from presenting rebuttal evidence to prove the confession's involuntariness had such evidence existed and petitioner chosen to present it. *Cf. United States v. Hathorn*, 451 F.2d 1337, 1340 (5th Cir.1971) ("if a defendant believes that the testimony of any officer [testifying as to the voluntariness of his confession] to be disingenuous, there is nothing to prevent him from calling [rebuttal] witnesses ... to the stand").[17]

#### 4. *Stale Miranda Warnings*

■ Jarrell confessed to the crime approximately three hours after receiving his *Miranda* warnings from Investigator Bish-

17. *Cantrell v. Maxwell*, 298 F.Supp. 1061 (S.D. Ohio 1969), also involved a situation in which the trial court had not specifically refused defendant's request to present evidence as to the involuntariness of a confession. The *Cantrell* court, nevertheless, determined that defense counsel "had no opportunity to adduce testimony relating to the reasons he felt his oral confession may not have been voluntary." *Id.* at 1063.

The circumstances surrounding that court's determination, however, are clearly distinguishable from those in the instant case. While in *Cantrell* evidence of record created "substantive ground for believing the petitioner's claim of involuntariness," *id.*, in the instant case the evidence of record and the circumstances described above in text reveal no such substantive ground for belief of petitioner's contentions.

op at the City Hall. Petitioner was never readvised of his rights, even after being arrested. From the time Jarrell received his warnings until the time he confessed, petitioner was (1) escorted from City Hall to Headquarters, where he was interviewed by Sergeant Blannott; (2) driven from Headquarters to the District Attorney's office, where a polygraph examination was administered; (3) driven back to Headquarters, where he was arrested by Sergeant Blannott; (4) interrogated for an additional 30 to 45 minutes by Blannott before confessing. Petitioner contends that under this chain of events, Jarrell's *Miranda* warnings should have been refreshed and, therefore, the confession was inadmissible.

Under the circumstances of this case, we do not view a confession given less than four hours after the issuance of *Miranda* warnings inadmissible because of the failure to reissue the warnings. Although Jarrell was not technically in custody until he was arrested,[18] he was a suspect from the moment he received his warnings. The record reflects that the warnings given were complete and that Jarrell understood them. *Cf. Edwards v. Indiana,* 412 N.E.2d 223, 225–26 (Ind.1980) (where defendant, not yet a suspect, was given orally his *Miranda* warnings and record contained no evidence of content of oral advisement, confession given 5 hours later when defendant had become a suspect not admissible). Furthermore, the fact that Jarrell confessed to a state officer (Blannott) other than the one who administered the *Miranda* warnings (Bishop), does not render the warnings insufficient, especially since, before interrogating Jarrell, Blannott asked Bishop in Jarrell's presence whether petitioner had received his *Miranda* warnings. (T.T. 545). *See State v. Gallagher,* 36 Ohio App.2d 79, 301 N.E.2d 888 (1973) (change from one state interrogator to another insufficient break to require fresh

warnings). *Cf. United States v. Hopkins,* 433 F.2d 1041 (5th Cir.1970), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1252, 28 L.Ed.2d 550 (1971) (change from state police officer questioning defendant about state crime to federal officer questioning about federal crime; no new warnings required); *Mitchell v. State,* 3 Tenn.Cr.App. 153, 458 S.W.2d 630 (1970) (questioning regarding different crime occurred on following day; no new warnings required). We conclude that no violation of petitioner's rights occurred by the failure to reissue the *Miranda* warnings at the time of arrest because the totality of the facts do not reflect that Jarrell was unaware of his rights, that he was pressured, or that he was mentally deficient or naive about the process that was under way. Additionally, Jarrell had had previous experience with law enforcement officers where his rights were explained.

### 5. *Sixth Amendment*

Apart from his fourth and fifth amendment claims, petitioner contends that the interrogation process violated his sixth amendment right to counsel. This contention is without merit. "[A] person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time adversary judicial proceedings have been initiated against him." *Kirby v. Illinois,* 406 U.S. 682, 689, 690, 92 S.Ct. 1877, 1881–83, 32 L.Ed.2d 411, 417, 418 (1972). By the time Jarrell had confessed, he had been advised verbally that he was under arrest, but no further formal action had been taken against him. It is settled in this circuit that mere arrest does not constitute an "adversary judicial proceeding[ ]" and, therefore, does not trigger the sixth amendment right to counsel. *Caver v. Alabama,* 577 F.2d 1188, 1195 (5th Cir. 1978). *See also McGee v. Estelle,* 625 F.2d 1206, 1208 (5th Cir.1980).[19] At the time of

18. *See* Part A.1., *supra.*

19. To the extent that the dicta in *Witt v. Wainwright,* 714 F.2d 1069, 1073 n. 1 (11th Cir.1983), *cert. granted,* —— U.S. ——, 104 S.Ct. 2168, 80 L.Ed.2d 551 (1984), indicates a contrary result, that decision is inconsistent with the precedent

of this circuit. While the *Witt* panel's dicta would seem to find some support in the law of the Ninth Circuit, *see United States v. Zazzara,* 626 F.2d 135, 138 (9th Cir.1980) (suggesting that sixth amendment right to counsel arises upon arrest), the majority of the courts which have considered the issue are in agreement with the

the confession, Jarrell had been arrested verbally, but the arresting officer had not even drawn up an arrest warrant. *See* note 6, *supra.* Therefore, petitioner's sixth amendment right to counsel was not violated.

### B. *Burden-shifting Jury Instructions*

■ It is constitutional error to shift to the defendant the ultimate burden of persuasion on an essential element of the crime. *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Petitioner alleges that several of the jury instructions unconstitutionally shifted the burden of proof to the defendant. Each charge is set out below.

### 1. *Alibi Charge*

■ Petitioner's only defense at trial was an alibi that he was at home at the time of the murder. After initially giving the jury a general "reasonable doubt" charge, the trial court charged the jury on the alibi defense as follows:

> ... Alibi is a defense and involves the impossibility of the accused's presence at the scene of the offense, at the time of its commission. And the range of the evidence, in respect to time, and place, must be such as to reasonably exclude the possibility of the presence, any evidence in the nature of an alibi should be considered by the jury, in connection with all other facts in the case, and if, in doing so, the jury should entertain a reasonable doubt as to the guilt of the accused, they should acquit.

(T.T. 898). The magistrate found this charge unconstitutionally burden-shifting and recommended that relief be granted on

this ground, but the district court concluded that the alibi instruction did not shift the burden of proof to the petitioner. The district court focused on the language "the range of evidence ... must be such as to reasonably exclude the possibility of presence ..." and concluded that the instruction had no burden-shifting effect. Petitioner contends that the district court's focus on that language was error because the charge contained other burden-shifting language. Specifically, petitioner contends that in charging the jury that "alibi is a defense and involves the impossibility of the accused's presence at the scene of the offense ...," the trial judge shifted the burden of persuasion to the defendant on an essential element of the crime—presence.

Relying on *Poole v. Georgia,* 551 F.2d 683 (5th Cir.1977), respondent maintains that no burden-shifting occurred. In *Poole,* the court held that the trial court's charge that "the range of evidence or showing in respect to time and place must be sufficiently strong to exclude the possibility of his presence at the scene of the alleged offense at the time of the commission thereof" did not unconstitutionally shift the burden of proof to the defendant. *Id.* at 685. The court observed that this "language does not put the onus on the defendant to prove anything." *Id.*

Petitioner contends that *Poole* is inapplicable, because that case did not involve the additional offending language that "alibi is a defense and involves the impossibility of the accused's presence at the scene of the offense." Br. for Petitioner at 27. This contention is erroneous, since the charge in *Poole* contained such language almost verbatim. *See* 551 F.2d at 684–85. Petitioner also contends that the *Poole* decision is inapplicable because the trial court in the

law of this circuit as stated in *Caver. See United States v. Dobbs,* 711 F.2d 84, 85 (8th Cir.1983); *United States v. Franklin,* 704 F.2d 1183, 1189 (10th Cir.1983); *United States v. Guido,* 704 F.2d 675, 676 (2d Cir.1983); *Tarpley v. Estelle,* 703 F.2d 157, 162 (5th Cir.1983); *Logan v. Shealy,* 660 F.2d 1007, 1012 (4th Cir.1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *Fuentes v. Moran,* 572 F.Supp. 1461, 1467–68 (D.R.I.1983); *United States v. Traficant,* 558 F.Supp. 993, 996 (N.D.Ohio 1983). *See also United States ex rel. Johnson v. Lane,* 573 F.Supp. 967, 970 (N.D.Ill.1983) (in Illinois, "adversary judicial proceedings" for purposes of the sixth amendment right to counsel begin "upon the issuance and filing of a complaint, information, or indictment").

instant case gave no "reasonable doubt" instruction. Again, this contention is contrary to fact. *See* (T.T. 889–90).

Notwithstanding *Poole,* petitioner relies upon *Dixon v. Hopper,* 407 F.Supp. 58 (M.D.Ga.1976), in support of its contention that the charge in the instant case was impermissibly burden-shifting. In that case, the trial court instructed the jury that an alibi defense must be shown by such evidence "as would reasonably exclude the possibility of the presence." 407 F.Supp. at 65. The *Dixon* court found that this language "clearly suggests" that the defendant bore the burden of proof. *Id.* Because this language is identical to the language used in the instant case, petitioner contends that unconstitutional burden-shifting has occurred.

In denying petitioner's burden-shifting alibi charge claim, the district court distinguished *Dixon* from the instant case by noting the absence of factors which "compounded" the difficulty in the *Dixon* case. In *Dixon,* the court discussed additional language of the jury charge, and concluded that the burden-shifting effect was exacerbated by the trial judge's suggestion that the jury must believe the defendant's evidence before they could acquit. *Id.* Whether the district court's conclusion that the *Dixon* decision could not stand without the additional discussion regarding the believability of defendant's evidence is questionable. Nevertheless, we acknowledged in *Poole* that *Dixon* was not reconcilable with our conclusion in that decision. 551 F.2d at 686. Viewing the instructions in their entirety, we deem the alibi charge in the instant case as the effective equivalent as that in *Poole.* Accordingly, we again reject *Dixon,* and we find no burden-shifting effect in the challenged instruction.

### 2. *Implied Malice and Sound Mind*

As set out below, petitioner challenges three aspects of the trial court's instruction to the jury concerning *mens rea.*

### a. Implied Malice Charge

■ The trial court instructed the jury on the presumption of malice as follows:

> ... [A] person commits murder, when he unlawfully, and with malice aforethought, either express or implied, causes the death of another human being. Express malice is that deliberate intention, unlawfully to take away the life of a fellow creature, which is manifested by external circumstances, capable of proof. Malice shall be implied where no considerable provocation appears, and where all of the circumstances of the killing, show an abandoned and malignant heart.

(T.T. at 894). Petitioner contends that this charge was erroneous because it instructed the jury that malice could be presumed if the jury found an absence of "provocation."

In *Lamb v. Jernigan,* 683 F.2d 1332 (11th Cir.1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983), this circuit considered a challenge to an identical jury instruction. The *Lamb* court concluded that, "[i]n view of the strong circumstantial evidence instruction preceding [the implied malice] instruction, ... we cannot conclude that reasonable jurors would have interpreted the latter [charge] as changing the reasonable-doubt burden of proof they were initially told the prosecution had to meet." *Id.* at 1340. Although the circumstantial evidence charge in the instant case was not as strong as the one in *Lamb,* we conclude that, viewing the instructions as a whole, reasonable jurors would not have interpreted the implied malice charge as burden-shifting.

### b. Deadly Weapon Charge

The trial court instructed the jury upon the effect of a deadly weapon as follows:

> If you find that homicide is proved to have been committed in this case, and with a weapon, which you find was, in the manner in which it was used, upon the occasion in question, a weapon likely to produce death, the law would presume malice and the intent to kill.

(T.T. at 894–95). Petitioner contends that this charge violated *Sandstrom, supra,* by instructing the jury that malice and intent

to kill would be presumed if the murder was caused with a "weapon likely to produce death." Br. for Petitioner at 30. In *Mason v. Balkcom*, 669 F.2d 222 (5th Cir. Unit B 1982),[20] this court relied on *Sandstrom, supra,* in holding that a virtually identical charge had an unconstitutional burden-shifting effect. However, in *Mason* the defendant presented a defense of shooting in self-defense and contended that use of a gun in such circumstances could not be used against him to presume malice. Here there is no such defense. As discussed below, we find that if such an instruction shifted any burden it would be harmless, and we need not discuss the niceties of the *Sandstrom* case here.

#### c. Sound Mind and Discretion

The trial court also charged the jury that:

> The acts of a person of sound mind and discretion are presumed to be the product of the person's will, but this is a presumption which may be rebutted.

Petitioner contends that although no conclusive presumption was created, the charge unconstitutionally shifted the burden of proof to the defendant. Several panels from this circuit have wrestled with similar instructions, and the court voted to rehear this issue in the last en banc session. *See Drake v. Francis*, 727 F.2d 990 (11th Cir.), *on pet. for reh'g and for reh'g en banc*, No. 83–8047, slip op. 2675 (11th Cir.1984); *Davis v. Zant*, 721 F.2d 1478 (11th Cir.1983), *on pet. for reh'g and for reh'g en banc*, No. 83–8244, slip op. 2265 (11th Cir.1984). Rather than await the en banc decision, we proceed to harmless error analysis.

#### 3. *Harmless Error*

■ For purposes of this portion of the opinion only, we assume that the "deadly weapon" and "sound mind and discretion" charges were unconstitutionally burden-shifting. We must now determine whether these constitutional errors might be harmless beyond a reasonable doubt.

*Franklin v. Francis*, 720 F.2d 1206, 1212 (11th Cir.1983), *pet. for rehearing en banc denied*, 723 F.2d 770 (11th Cir.1984), *cert. granted*, — U.S. —, 104 S.Ct. 2677, 81 L.Ed.2d 873 (1984); *Brooks v. Francis*, 716 F.2d 780, 793–94 (11th Cir.1983), *on pet. for reh'g and for reh'g en banc*, 728 F.2d 1358 (11th Cir.1984); *Lamb v. Jernigan, supra*, 683 F.2d at 1342. An unconstitutional burden-shifting instruction might be held harmless if "the evidence of guilt is so overwhelming that the error could not have been a contributing factor in the jury's decision to convict." *Mason v. Balkcom, supra*, 669 F.2d at 227. We hold that the evidence of Jarrell's guilt was overwhelming. There were witnesses who placed petitioner in the victim's car on the day of the murder. The abandoned vehicle was found not far from petitioner's residence. The weapon which was shown to be the murder weapon was one which had been in petitioner's possession at the relevant time. Petitioner's fingerprints were found on items which had belonged to the victim and had been in her car just prior to her disappearance. Furthermore, in light of petitioner's confession which was found to be voluntary and was admitted at trial, petitioner's defense of alibi was very weak. Therefore, we also hold that the burden-shifting jury instructions were harmless error.

#### C. *Exculpatory Evidence*

Petitioner contends that the prosecutor denied him valuable exculpatory evidence by failing, first, to reveal the name and statement of the only eyewitness who had seen the victim with a man near the time of the victim's death and second, to turn over the names of the other suspects.

#### 1. *The Eyewitness*

John Thomas Wallace saw the victim with a man on the day of the murder and assisted the police in constructing a composite drawing. The only recorded version of Wallace's statement concerning his viewing a man with the victim before her death is contained in a sworn affidavit of Ser-

---

**20.** Former Fifth Circuit case, binding.

geant Blannott given in support of his application for a search warrant. This affidavit states that Mr. Wallace described a white male who was with the victim on December 24, 1973, and helped prepare a composite drawing of that individual. The affidavit concludes that the petitioner, "David Jarrell[,] fits the physical make-up of said person." (Respondent's Exhibit I, p. 4). Petitioner contends that this affidavit contains a statement *by Wallace* that David Jarrell was the individual that he saw with the victim on December 24, 1973. Later, however, Wallace told police he could not identify anyone because he did not see the person long enough nor did he recognize the person as someone he knew. Because, in petitioner's view, the affidavit contained Wallace's "testimony" that David Jarrell resembles the man he saw with the victim, petitioner argues that Wallace's later statement that he "could not identify anyone" was a contradiction which rendered the affidavit "exculpatory." Because it was "exculpatory," petitioner argues, the affidavit should have been turned over to the defense under the requirements of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

 Petitioner's contention is specious. The only "statement" made by Wallace was the generalized description of a white male who he had seen with the victim but was unable to identify. The conclusion at the end of the affidavit in support of the search warrant that the petitioner fits the physical makeup of the person described by Mr. Wallace is obviously the conclusion of Sergeant Blannott, not Mr. Wallace. Thus, there is no contradiction in Wallace's testimony, and the information was not exculpatory.[21] Even if it were exculpatory this affidavit was available to petitioner from the beginning of the defense's investigation. *Brady* does not require the government to turn over information which, "with any reasonable diligence, [the defendant] can obtain himself." *United States v.*

*Campagnuolo,* 592 F.2d 852, 861 (5th Cir. 1979). Accordingly, we find no *Brady* violation.

#### 2. *Evidence of Other Suspects*

While investigating the murder, the police investigated various leads and came up with several "possible suspects." Petitioner contends that a *Brady* violation occurred because the defense and the jury had a right to know the names and evidence concerning these other suspects. The respondent contends that these "possible suspects" were not readily identifiable, in that these "possible suspects" were merely talked to by the police to see what possible information they might have; none of these persons were suspects in the sense that the investigation actually focused on them.

 *Brady* requires the prosecution to produce evidence that someone else may have committed the crime. *See Sellers v. Estelle,* 651 F.2d 1074 (5th Cir.1981). In comparison with the other suspect in *Sellers,* the "other suspects" in the instant case were ephemeral. In *Sellers,* police reports indicated that another person had actually admitted committing the crime with which defendant was charged. *Id.* at 1075. In the instant case, police reports listed hundreds of possible suspects. Finding a *Brady* violation under these circumstances would be tantamount to requiring the government to turn over their entire investigation. Because *Brady* created no such general constitutional right to discovery, *see Weatherford v. Bursey,* 429 U.S. 545, 559–60, 97 S.Ct. 837, 845–46, 51 L.Ed.2d 30 (1977), petitioner has failed to show a due process violation.

#### D. *Recusal*

The trial judge in the instant case was a former district attorney who had prosecuted the defendant in a case involving assault with intent to rape. Defendant was 15 years old at the time, but was

---

**21.** Because we find that the information was not exculpatory, we do not address *Brady's* materiality requirement, although the marginal role Wallace played in the prosecution's case raises some doubt as to materiality as well.

prosecuted as an adult. Defendant entered a guilty plea. In the instant case, petitioner's counsel at trial specifically stated that he did not wish to move for disqualification. (T.T. at 83). Petitioner's present counsel, however, maintains that the judge's failure to recuse himself *sua sponte* was error.

■■■■ The mere fact that a judge acted as prosecutor in an unrelated case is insufficient to constitute reversible error. *Goodspeed v. Beto*, 341 F.2d 908, 909 (5th Cir.1965), *cert. denied*, 386 U.S. 926, 87 S.Ct. 867, 17 L.Ed.2d 798 (1967). Petitioner has cited no prejudicial rulings, nor has he cited to any area in which the judge appeared to be biased in his rulings. Additionally, cases cited by petitioner which hold that the trial judge deprived the defendant of his constitutional due process rights involved cases where the judge was the trier of fact. *See, e.g., United States v. Denno*, 313 F.2d 364, 374 (2d Cir.1961), *cert. denied*, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963). The instant case, however, was a trial by jury. We find no error in the judge's failure to recuse himself.

### E. *Traverse Jury Pool*

■■■ Forty of the forty-two panel members from which the jury in the instant case was selected were male and the traverse jury pools for 1973 were 92.56% male and for 1975 were 72.7% male. Because petitioner did not make a timely challenge to the jury composition, a procedural default exists and petitioner must show "cause and prejudice" before being allowed to make the challenge to the composition of the jury. *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976).

■■■ A finding of cause must be based on a determination that a miscarriage of justice was suffered and no strategic advantage was gained by failing to comply with the procedural rule. *See Harris v. Spears*, 606 F.2d 639 (5th Cir.1979). Trial counsel testified before the district court that, because of the nature of the

crime, he wanted an all-male jury. Thus, counsel's decision was based upon trial strategy, that strategy was reasonable, and no cause has been shown. Petitioner has waived his right to challenge the composition of the traverse jury pool.

### F. *Veniremen's Prejudicial Comments*

During voir dire two veniremen stated that they possessed information that would prevent them from making an unbiased decision if they were selected as jurors. The first of these two indicated that he had spent time in jail with the defendant before trial. The district attorney then pursued the following line of questioning:

MR. HUFF: All right. Would the fact that you met [defendant] and any conversations you might have had with the defendant, would this affect your ability to serve in this case?

THE JUROR: That's right.

 * * * * * *

MR. HUFF: Your Honor please, I believe he would probably be subject to challenge for cause.

THE COURT: Any questions you would like to ask Mr. Venable [defense counsel], of this juror?

MR. VENABLE: I don't at this period, your Honor.

THE COURT: Mr. Juror, are you saying to the Court that your mind is so, your opinion is so fixed in your mind that you could not weigh the evidence fairly and impartially?

THE JUROR: That's right.

THE COURT: You do not feel that you could listen to the evidence, the sworn testimony presented in this case and then make up your mind as to the guilt or innocence of this defendant?

THE JUROR: You know, like I said, we was over there all in the same place, and we were over there over that weekend. We all shared what we had over there in the cell, you know.

THE COURT: All of what?

THE JUROR: What we had, we shared over there in the jail, I mean, you know

what we had in there, all of us shared it together, and I don't think I could.

THE COURT: You don't think you could render a fair and impartial verdict based on the testimony?

THE JUROR: No sir, I don't.

THE COURT: All right. The Court is going to excuse you....

(T.T. at 85–87). The second allegedly prejudicial remark was made by an editor of a local newspaper during questioning by defense counsel:

MR. VENABLE: Have you read any items or news items concerning this case or have you yourself wrote any items, news items concerning this case, as you, yourself or anybody working for you?

THE JUROR: Yes, sir, several.

MR. VENABLE: I mean your own writers?

THE JUROR: Reporters and I have written stories.

MR. VENABLE: I mean do you censor them before they are published?

THE JUROR: I look at the stories, yes, sir.

\* \* \* \* \* \*

MR. VENABLE: And having that knowledge and having had that opportunity and being the paper in which you are connected with, has this in any manner prejudiced your mind?

THE JUROR: I have privileged information that hasn't been in print, in all fairness I think I probably should not be a juror.

\* \* \* \* \* \*

MR. VENABLE: Because you might be somewhat prejudiced?

THE JUROR: Yes, sir.

\* \* \* \* \* \*

MR. VENABLE: I think your Honor, the gentlemen is fair and I think this would disqualify him.

(T.T. at 178–79). The juror was excused. ▮ Although inflammatory remarks made while empaneling the jury can

be grounds for reversal,[22] not all opinionative responses by jurors require a new trial. Rather, the test is whether the offending remark has prejudiced the defendant to the extent of denying him a fair trial. *See United States v. Pantone,* 609 F.2d 675, 679 (3d Cir.1979); *United States v. Morrone,* 502 F.Supp. 983, 1003 (E.D.Pa.1980). In the instant case, the two excused jurors revealed neither the nature of the information which they deemed prejudicial nor the actual nature of their prejudice. Consequently, the other veniremen were exposed to only nebulous references to extrinsic information which might have affected the individual's own impartiality. Therefore, we find no possibility of prejudice stemming from the prospective jurors' remarks. *See Russ v. Israel,* 531 F.Supp. 490, 495 (E.D.Wis.1982) (no prejudice in prospective juror's remark that she could not serve impartially because she had "seen those guys [the petitioner and his co-defendant] around the neighborhood"). *See also United States v. Wade,* 467 F.2d 1226, 1229 (8th Cir.1972) (no error in denying motion for mistrial where prospective juror indicated that she knew defendant because he had shot her son; remark was innocently made and did not indicate whether shooting was accidental or intentional).

### G. *Special Prosecutor*

▮ At trial, a special prosecutor assisted the district attorney. Petitioner contends that the participation of the special prosecutor rendered his trial fundamentally unfair first, because the special prosecutor was also a witness for the state and second, because he made inflammatory remarks during closing argument. Neither contention has merit. The special prosecutor's testimony was uncontested, cumulative, and did not link the defendant to the crime. His remark during closing argument that he "represented the victim's family" was not calculated to inflame the jury; rather, he merely attempted to explain who he was and why he was there.

---

**22.** *See United States v. Lord,* 565 F.2d 831, 836 (2d Cir.1977) (prosecutor's remarks and jurors'

responses required immediate declaration of mistrial).

### H. Ineffective Assistance of Counsel

While petitioner seeks a new guilt-innocence trial, he cites several grounds for ineffective assistance which occurred during his sentencing trial. Two of these grounds served as the basis for reversal of defendant's death sentence. Petitioner contends that, because the courts' required analysis of "the 'totality of circumstances' encompasses the quality of counsel's assistance from the time of appointment or retention through appeal,"[23] counsel's ineffectiveness at the sentencing trial should support a claim of ineffectiveness in the guilt-innocence trial. Petitioner's Brief at 56.

Although petitioner is correct in contending that the "totality of circumstances" standard requires this court to examine all phases of representation, the suggestion that errors committed during the sentencing trial warrant a new guilt-innocence trial is without merit. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland v. Washington*, — U.S. —, —, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Generally, the defendant must demonstrate that an attorney error was prejudicial to prevail on an ineffectiveness claim. The burden to prove prejudice requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at —, 104 S.Ct. at 2056. Under this standard, the alleged errors which occurred in the sentencing trial clearly do not demonstrate any prejudice warranting this court's grant of the relief sought—a new guilt-innocence trial.

In view of our disposition of petitioner's alleged errors in Subparts A through G above, the remaining allegations of ineffectiveness are also without merit. Moreover, testimony at an evidentiary hearing held before the district court reveals that petitioner's counsel filed appropriate pretrial motions, discussed the case extensively with the district attorney, interviewed all of the police officers involved in the case prior to trial, interviewed all of petitioner's witnesses, obtained a psychiatric evaluation of petitioner, made numerous objections at trial, and vigorously cross-examined the government's witnesses. *See* Magistrate's Report, *supra* at 49. Therefore, the "totality of circumstances" reveals that petitioner's trial counsel was capable of rendering and did render reasonably effective assistance.

### III. CONCLUSION

Finding no merit in petitioner's contentions, we affirm the district court's denial of the writ of habeas corpus.

AFFIRMED.

---

**23.** *Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir.1982).